# Rains *v.* The State.

### *Indictment for Murder.*

1. *Change of venue.*—The application for a change of venue in this case (Code, §§ 4485-6) was properly refused, on the authority of the case of *Hawes v. The State*, at the present term, the testimony adduced being much less convincing, and not sufficient of itself, without regard to the opposing testimony.

2. *Evidence as to interview between parties, prior to homicide.*—The defendant being indicted for the murder of his brother, who was found dead in the public road, in the morning after they had started to ride home together by night, having attended the trial of a suit in court,

[Rains v. The State.]

brought by defendant against a third person, for slanderous words alleged to have been spoken of his daughter; the witnesses who were present at the trial, may speak of it by way of introduction and explanation, as accounting for the presence of themselves and others at that time and place, but can not state any of the particulars; but, the prosecution having proved that, at the conclusion or continuance of the slander suit, the deceased accepted a trifling loan from the defendant in that suit, and that the defendant thereupon expressed his irritation or displeasure, saying that his brother "had sold out to A. [his adversary], and that anybody who would drink with A. was as mean as he was,"— this authorized proof that there was a slander suit, and who were the parties to it, but not of any further particulars.

3. *Same; evidence rebutting aggravation.*—It was shown that the defendant and the deceased quarrelled while riding home together on the night of the homicide, and the defendant stated, testifying in his own behalf, that during their quarrel the deceased spoke of his daughter, the subject of the slander suit; and being asked, on cross-examination, if what the deceased said was slanderous, he answered that it was not. *Held.* on objection to the question and answer, that the evidence was properly admitted, as tending to rebut any inference of aggravation from the words spoken by the deceased about the defendant's daughter.

4. *Threats by defendant against deceased.*—Threats made by the defendant against the deceased, at different times, declaring that he would kill him "if it took him twenty years, or a life-time," are admissible as evidence against him, although no special connection is shown between them and the fatal difficulty.

5. *Cross-examination of witness.*—A witness for the prosecution, who, on cross-examination, admits that he has made statements out of court inconsistent with his testimony on the trial, can not then be asked, "Is what you say about that as true as everything else you have testified to in this case?"

6. *Cross-examination of defendant, testifying for himself.*—When the defendant testifies in his own behalf, on a prosecution for murder, he may be asked on cross-examination, "where he was each day and night from the night of the killing until he was arrested," about a week afterwards.

7. *Abstract charges* are properly refused; as where a charge asked is based on the hypothesis "that the evidence fails to show any motive for the commission of the crime" by the defendant, when there is evidence of a motive; or is based on the hypothesis that "the prosecution relies on circumstantial evidence alone," when there is also direct and positive evidence.

8. *Argumentative charges* are properly refused, and also charges which assume a fact as proved, when there is no evidence of it.

9. *Charge as to self-defense.*—A charge instructing the jury that, "to warrant an acquittal on the ground of self-defense, the defendant must have been wholly without fault—must not have provoked or encouraged the difficulty by word or act," asserts a correct proposition under the facts of this case.

FROM the Circuit Court of Morgan.

Tried before the Hon. JOHN MOORE.

The defendant in this case, Robert J. Rains, was indicted for the murder of his brother, Bone Rains, by cutting him with a knife; was convicted of murder in the first degree, and sentenced to be hanged. Before going to trial, the defendant submitted an application for a change of venue, on the

[Rains v. The State.]

ground that he could not get a fair and impartial trial in the county. In his application he stated that, when he was arrested at Moulton, Lawrence county, and his arrest became known, a mob was formed to take him from the custody of the deputy-sheriff and hang him, and that the officer avoided the mob by travelling another route. J. M. Echols, the deputy-sheriff by whom the defendant was arrested and brought back, being examined as a witness in his behalf, testified that he never heard of any mob, and that he travelled with his prisoner on the usual mail route; that he had heard " right smart talk about the killing, but no more than there is generally over any killing; never heard any body say that defendant ought to be hung, or ought to have his neck broken; but the people generally believed that he killed his brother, and have heard people say, if he did kill his brother, he ought to abide the consequences of the law." W. J. Owens, another witness for the defendant, thus testified: "I have heard some people say they thought he ought to have justice—that they believed him guilty, and ought to be tried for it according to law, and have justice done him; don't know that I ever heard any one say he ought to be hung, but have heard people say they believed he killed his brother. The general opinion of the people I have heard speak of it is, that he is guilty: but I have not heard many talk about it,—not more than two dozen." The affidavits of N. H. McCollum and W. C. Cornelius were also submitted, but whether for or against the application the record does not show. The court overruled the application, and the defendant excepted.

It appeared on the trial, that the dead body of the deceased was found in or near the public road, about five miles from Hartselle, early in the morning, one day in January, 1889; and near by were found a pair of gloves and a nubia, or wrap, which was identified as belonging to the defendant. It was shown, also, that on the preceding day, the defendant, the deceased, J. L. Alexander and several other persons, were in Somerville, in attendance on the County Court, where a suit, or criminal prosecution, was pending against Alexander, for slanderous words alleged to have been spoken by him about the defendant's daughter; the affidavit on which the suit, or prosecution, was founded, having been made by the deceased. The case was not tried, and the parties in attendance started for home in the afternoon; the defendant and his brother, with J. D. Simms, being on horseback, and the

others in Alexander's wagon. They all stopped at Hartselle about dusk, and " ate some crackers and oysters," for which Alexander paid; and Alexander further testified, that, "having made friends with Bone," the deceased, he lent him 25 cents, with which to buy a pint of whiskey. The parties separated at the fork of the roads several miles beyond Hartselle, the defendant, the deceased and Simms going to the right, while the others took the left road. Simms further testified, on the part of the prosecution: " Defendant saw Alexander hand Bone the quarter, and immediately remarked, 'Bone has sold out to Alexander.' We got on our horses, and started home," separating from the others; as above stated. " Defendant was quarrelling with Bone, telling him he had sold out to Alexander, and that any body who would drink with Alexander was as mean as he was. This was kept up for some distance, Bone not being angry in the mean time, and telling him, 'I know what you want, you want a drink of this whiskey,' and gave him a drink or two of it. Just before the difficulty, defendant said to Bone, ' Why did you make that affidavit any way?' to which Bone replied, ' If I had known it was going to cause me and my wife as much trouble as it has, I never would have made it.' We were then riding abreast, and I was between them. Defendant replied to what Bone had said, cursing him and his wife, and saying, ' They are no better than me and my wife.' In a very short time Bone stopped, and got off his horse, standing by his side with his back to me, and his face towards the horse's tail, as if making water. I next saw defendant, who I did not till then know had dismounted, going around in front of the horses, towards Bone, with his coat off; and said to him, ' None of that, Bob; let's behave ourselves, and go home as we should do.' Bone then turned around to look behind, and, as he did so, the defendant struck him about the head or shoulders. Bone then knocked defendant down, and was on him, when I pulled him off as soon as I could. As I pulled him up, he staggered, and fell to his knees, and asked me to help him, saying that he believed he was drunk. I assisted him to the side of the road, and set him down, while I went after the horses, leaving the defendant there. I was gone twenty or thirty minutes, and, on returning with the horses, met defendant one hundred yards or more from the place. I asked him where Bone was, and he answered, ' Where you left him. I went back, and found Bone lying on the ground, spoke to him, and shook him; he was dead, and I told defend-

[Rains v. The State.]

ant so. He replied, 'You cant say I did it; you did not see me do it.' I proposed to go and get some one to care for the body, but he said that I should not—that it would give us away, and that we must get away. He also said to me, ' You have got to do as I tell you, and if you dont, or if you tell it, I will kill you.' " On cross-examination, this witness "admitted that he had said to several persons named, that he knew nothing at all about it; and said that this was before defendant was put in jail, and that he said so because he was afraid defendant would kill him, as he had said he would." Defendant's counsel then asked him, " Is what you say about that as true as every thing else you have testified in this case? " The court sustained an objection to this question, and the defendant excepted.

After two witnesses for the prosecution had testified as to the finding of the body, and before the examination of Simms or Alexander, J. H. Kitchen was introduced as a witness for the State, and thus testified: "I was in Somerville on the day preceding the night on which it is said Bone Rains was killed. I came as a witness before the County Court, in a case in which Alexander was charged with having slandered the defendant's daughter. Defendant, Bone Rains, Simms, Alexander, Knapp and myself were here that day. The case was not tried, and we all left about 3 P. M. to go home." Defendant moved to "exclude from the jury what the witness said about the trial in the County Court, because it was irrelevant:" and he excepted to the overruling of his motion. W. R. Crow, another witness for the State, testified that, "within twelve months before Bone Rains was killed, defendant told him that Bone had knocked him down, and thought he had killed him; that he intended to do Bone just as Bone thought he had done him, if it took him twenty years, or a life time; and that he intended to do it when Bone was not expecting it." Arch. Johnson, another witness for the State, testified that, "in the Spring of 1888, defendant told him, that Bone had knocked him down with a single-tree, and then went to the woods with his gun, and stayed · there three days; that the next time Bone offended him, or made him mad, he would kill him, in the woods or out of the woods, if it took him twenty years to do it." The defendant objected to the admission of this part of the testimony of each of these witnesses, "on the ground that it was too remote, and was incompetent;" and he excepted to the overruling of his objections.

[Rains v. The State.]

The defendant testified in his own behalf, and said: "We had been to Somerville, and on our way home, after leaving Hartselle, me and my brother had some words about my daughter. Just beyond Vaughan's Bridge, where the difficulty took place, I got down to make water; and the first I knew Bone knocked me down, jumped on me, and was cutting me with his knife, when I pulled out mine, and made one cut at him. I did not know I had cut him." He was asked on cross-examination, "What were the words you and your brother had about your daughter?" and answered, that he did not remember. "The solicitor then asked him, if his brother said anything, or slandered his daughter; and answered, that he did not." To the last question and answer each the defendant objected, "because it was illegal and irrelevant;" and an exception was duly reserved. The defendant was further asked, on cross-examination, "Where he was each day and night, from that Monday night until he was arrested;" and the court allowed the question and answer, against his objection and exception.

The court charged the jury, "that to warrant an acquittal, on the ground of self-defense, the defendant must have been wholly without fault—that he must not have provoked or encouraged the difficulty by word or act." The defendant excepted to this charge, and he also excepted to the refusal of each of the following charges, which were asked by him in writing: (5.) "When the evidence fails to show any motive to commit the crime charged on the part of the accused, this is a circumstance in favor of his innocence." (8.) "When the prosecution relies for a conviction on circumstantial evidence alone, if there is one single fact proved to the satisfaction of the jury, by a preponderance of the evidence, which is inconsistent with defendant's guilt, this is sufficient to raise a reasonable doubt, and the jury should acquit." (20.) "The jury are authorized, in forming their conclusions as to whether the defendant had reason to apprehend danger of his life, or of great bodily harm, to take into consideration the fact, that the deceased had at one time almost killed the defendant, having struck him on the head with a single-tree, and that the deceased held him down on the ground, and was a much younger, larger, and more powerful man; and if they do so find that the defendant's life was in danger, or that he was in danger of great bodily harm, without having first attacked deceased, and that he

[Rains v. The State.]

struck the fatal blow whilst laboring under such fear,—then they must find the defendant not guilty."

S. H. GRUBER, for appellant.

WM. L. MARTIN, Attorney-General, for the State.

STONE, C. J.—After the able and exhaustive discussion of the question of change of venue called forth by the recent case of *Hawes v. State*, at the present term, it would seem to be unnecessary to repeat or reconsider what was then decided. The present application was supported by testimony much less convincing than was given in that case. In fact, taking all the testimony purporting to have been offered by the defendant, without reference to the proof in opposition, and it fails to make a case for a change of venue.

None of the particulars of the slander suit were proven, or offered to be proven. It was simply referred to by the witnesses, as introductory to the narration of their testimony proper. It tended to show why the participants and witnesses were brought together, and why they were present at the times and places mentioned. Up to this stage, there was nothing that could have done the defendant any injury. It was, at most, a reproduction of what is often witnessed in *nisi prius* courts—a statement of what caused the assemblage, and why the witness was present. Such statements are never supposed to harm any one, unless they unnecessarily consume the valuable time of the court. In the progress of the trial, however, an incident, considered in its relation to that slander suit, does seem to have contributed to the quarrel which preceded, and, according to appearances, precipitated the homicide. We allude to the trifling loan of twenty-five cents' by Alexander to the deceased. Alexander was the defendant in the slander prosecution, and defendant's daughter was the subject of the alleged slander. Accepting the trifling loan from the alleged slanderer, seems to have angered the defendant, and contributed to, if it did not cause the quarrel. This authorized proof that there was a slander suit, and who were the parties to it. It did not authorize proof of the particulars, and none such was made or offered. There was no error in the court's rulings on this question. It tended to give pertinency and point to the remark attributed to the defendant at the time deceased accepted the loan.

[Rains v. The State.]

While the defendant was testifying in his own behalf, he stated that, during the quarrel between him and the deceased, the latter spoke of his, the defendant's daughter. In the cross-examination, he was asked if what the deceased had said in reference to his daughter was slanderous. This question was objected to, the objection overruled, and the defendant answered that it was not. There was nothing in this objection. The law has reasonable respect to the infirmities and natural resentments common to humanity, and certainly accords to a father some palliation, if slanderous words are uttered to him in reference to his own daughter. It may have weight in determining the *animus* and grade of the homicide, or other violence that may ensue upon it. It could not excuse homicide, or other high crime. Disproof of what might otherwise have been inferred—namely, that the reference to the daughter gave offense—was clearly competent, as tending to aid the jury in determining who was the aggressor in the encounter.

The threats of defendant, running through many months, and coming down to a time very near the homicide, were all properly admitted in evidence. Each and all of them were admissible on the inquiry of malice *vel non.—McAnally v. State*, 74 Ala. 9; *Garrett v. State*, 76 Ala. 18.

We know of no rule of law which requires, or authorizes a witness, to institute a comparison between the truthfulness of different parts of his testimony. All should be truthful, and equally truthful, if the witness observes his oath; and it is for the jury to determine to what extent they will believe, or disbelieve, his testimony. The question was properly disallowed, as being immaterial in the aspect in which it was sought to have the witness answer.

It is always competent to prove the conduct of a prisoner at the time a crime was committed, or shortly afterwards. Many criminating circumstances are thus brought to light. And the fact that this was sought to be proved by the defendant himself, does not vary the question. He voluntarily made himself a witness in his own behalf, and, in doing so, submitted himself to cross-examination, to attack on his general character for veracity, and to every other mode of attack on his credibility, to the same extent as if he had been a disinterested witness, with the limitation expressed in *Clarke v. State*, 78 Ala. 474. "As to any fact or circumstance relevant to the issue, or which sheds light on the commission and character of the offense, though incul-

[Rains v. The State.]

patory, he waives his constitutional right to protection against being compelled to give evidence against himself. But the waiver extends no farther than to all such facts and circumstances as may tend to illustrate the particular offense charged. . . . Within these limits, the fullest cross-examination should be allowed; but its range into inquiries respecting past transactions and offenses, separate and distinct, is prohibited by the constitutional inhibition."—*Clarke v. State,* 87 Ala. 71; *Cotton v. State, Ib.* 103.

Each of the charges asked by defendant was faulty, and was rightly refused. Charge five postulates that defendant was without motive to commit the homicide. The testimony, if believed, tends strongly to prove a double motive. *First,* deep-seated feelings of revenge, harbored by defendant against deceased, for knocking him down with a single-tree, as he alleged he had done. This was the basis of his threats, as testified by the witnesses. *Second,* the acceptance by the deceased of a trifling loan from Alexander. This was on the evening of the homicide, and shortly before it occurred, as testified to by the witness Simms. This witness also testified, that the acceptance of this loan led to the quarrel which ended in the rencontre and homicide. No phase of the testimony tends to support the hypothesis of this charge; and it was rightly refused for that reason, if for no other.—*Knowles v. Street,* 87 Ala. 357; *Perry v. State, Ib.* 30; *Calhoun v. Hannan, Ib.* 277; 3 Brick. Dig. 133, § 106; *Williams v. Barksdale,* 58 Ala. 288.

The same objection applies to charge 8. The prosecution did not "rely on circumstancial evidence alone." Simms, and even the defendant himself, gave positive testimony proving that defendant committed the homicide, if they be believed. Moreover, no testimony is shown which tended in the slightest degree to prove any fact which was inconsistent with the defendant's guilt. A charge which is not supported in its hypotheses by any phase of the testimony, is abstract, and should be refused, no matter how correct the legal proposition it may assert.—Authorities *supra.*

Charge 20 postulates, as a fact, that deceased had "struck the defendant on the head with a single-tree." There is no proof that such had ever been the case, unless the fact that the defendant gave that as the reason and basis of the threats the witnesses testified he had made. The assumption that this was a fact required its refusal, even if it had been otherwise unobjectionable. It had the further fault of

[Engelhardt v. The State.]

being argumentative.—*Cotton v. State*, 87 Ala. 75·; *Goldsmith v. State*, 86 Ala. 55; *Hussey v. State*, 86 Ala. 34; *Fire Brick Works v. Allen, Ib.* 185.

The charge given by the court, in view of the testimony before the jury, asserts the correct rule on the doctrine of self-defense, and is free from error.—*DeArman v. State*, 71 Ala. 381; *Cleveland v. State*, 86 Ala. 1.

The judgment of the Circuit Court is affirmed.

The day fixed for the execution of the sentence of the law being passed, it is ordered and adjudged by the court, that Friday, the 14th day of March, 1890, be set for such execution; and on that day the sheriff of Morgan county will inflict the death penalty by hanging the said Robert Rains by the neck until he is dead—the execution to take place between the hours of 10 A. M. and 4 P. M., and strictly according to the provisions of the statute.—Code of 1886, § 4667.