78 So.2d 805

Harold **SHIFLETT**

v.

**STATE.**

**7 Div. 264.**

Supreme Court of Alabama.

March 10, 1955.

Love & Hines, Talladega, Fife & Stanford, Atlanta, for appellant.

John Patterson, Atty. Gen., and Robt. Straub, Asst. Atty. Gen., for the State.

PER CURIAM.

This appellant was convicted of murder in the first degree for killing his wife and sentenced to the penitentiary for life.

At the conclusion of the evidence for the State defendant's counsel moved to exclude the evidence for that (in substance) it was not sufficient to support a verdict of guilt. The court overruled the objection and defendant excepted. This is not improper practice in criminal cases, though not permissible in civil cases. Robinson v. State, 222 Ala. 541, 133 So. 578; Langham v. State, 243 Ala. 564(10), 11 So. 2d 131.

The witnesses for the State had testified that Elizabeth Shiflett, wife of defendant, was shot with a twenty-two caliber rifle on the morning of August 5, 1954, at the home of her father, Walter Griffin. Elizabeth, called Betty, had married defendant seven years previously, when she was fourteen years of age. She and defendant had a small child named David who was about two years old. Deceased had a brother named Donald Griffin who lived in the home of their father and he owned the rifle used in this case. Defendant went to the home of Walter Griffin about 8 o'clock in the morning of August 5th. Betty had spent the night there the night before. In the father's home there was a hall extending through the center of the house with three bedrooms on the left, numbered for convenience on a diagram in evidence as 1, 3 and 5, consecutively—all bedrooms. The three rooms on the right were the living room, dining room (numbered 2 and 4) and a kitchen.

When defendant came to the house that morning Mrs. Martin, the grandmother of deceased, who was living in the house, was sitting on the front porch. He said nothing to her but went in through the front door. Mrs. Martin had been in the back bedroom (No. 5) where deceased had been lying on the bed which was in the northeast corner of the room. Her head was toward the foot of the bed. The room was about ten by fourteen feet. There was a door between that room and the adjoining one (No. 3) which was used by Mrs. Martin. The bed in her room was also in the northeast corner of it, with the foot of the bed extending over part of the door opening between the rooms. There was a sewing machine in front of and to the center of the bed. According to the evidence, a few minutes (four or five) after defendant went into the house, Mrs. Martin went back into her room (No. 3), where she could see into the room previously occupied by deceased (No. 5). Defendant was sitting on the bed near the foot (in room No. 5). He did not then have a rifle or any sort of gun in his hands. Deceased was sitting in a chair in room No. 3 near the fireplace on the west side of the room. The witness did not see the little boy (David). She asked deceased if she was ready to eat her breakfast, but received no reply. The door was open between rooms 3 and 5 and Mrs. Martin could see defendant sitting on the bed in room No. 5. Mrs. Martin then went into the kitchen where she had dinner cooking. The kitchen was across a back hall (or porch) opposite room No. 5. She stayed in the kitchen a few minutes and then went back to her bedroom (No. 3) and again asked deceased if she was ready to eat. Defendant was still sitting on the bed in room No. 5 and deceased sitting in a chair in room No. 3 as before. They were not then talking. The baby had wet his pants and the floor and witness got a mop to clean the floor. Deceased had just dried the baby but she was then sitting in the same chair. Witness told deceased her bread was ready. Defendant said nothing. Witness was preparing some okra for the deep freeze and went "back there". She had been back there a minute when she heard deceased say "David, put down those shells". She did not hear defendant speak. The next thing (while she was "nubbing" the okra)

she heard a scream and deceased said "Oh, Harold!", and the gun fired just as she said "Harold". The gun fired on the last word she said—just as she finished the word "Harold". Witness then testified: "It seemed like it just throwed me still in my tracks for a second and I would have to hold to walk but I got turned around to the clothes drier and the washing machine and to a chair as I went through and then the door shutter and when I got in to the room I saw her laying on the floor with her eyes blared open. She didn't move a finger nor a toe and just as I got up to her shoulders he come up to her feet. I screamed at her, 'What in the world has happened?' He said, 'I have shot Betty, but it was an accident, so help me God'. And about that time the telephone rung and I answered it. It was the second door neighbor's maid. She asked me what was the matter and I told her and told her to call Dr. Hardwick. Then I went back and he showed me where he had shot her and I told him to call Dr. Hardwick and call an ambulance, and he said 'No, he would take her hisself.'" Mrs. Martin reached deceased's head and shoulders by the time defendant got to her feet. She was lying on her back. The witness indicated on a drawing that deceased was lying on the floor at the foot of the bed in room No. 3, with her head toward the southwest and her feet toward the northeast and nearer the bed than her head. Her feet were possibly ten inches from the door at the corner of the bed.

Mrs. Martin testified that her grandson, Donald Griffin, a brother of deceased, had a twenty-two rifle in the house. It hung on the wall right over the bed in room No. 5. A shot gun also hung at the same place. The rifle hung about twenty-nine inches above the bed. It was seven or eight feet from the place where witness had seen defendant sitting on the bed to the place where deceased's feet were after the shot was fired. Immediately after the rifle was fired it was on the bed with the stock toward the foot of the bed and the barrel toward the head. A neighbor, Ida Chandler, came in while the rifle was still on the bed. The shotgun was not moved. The rifle had not been bothered. Defendant

got up and carried deceased out to the car and left with her. Those two alone left in the car for the hospital. The witness picked the rifle up and turned it over to the "law", Walton Haynes. Witness put the gun (not the rifle) in the closet. She found an empty cartridge on the floor in room No. 5 a few inches from the side of the bed where defendant had been sitting. She found only one empty shell which she turned over to the officers. It was a long twenty-two rifle cartridge that had been fired. That was all she turned over to them at that time; but later she said she gave them a long black shell that "was sitting on a what-not above the dresser". She stood and watched the officers unlock the rifle, "when they unbreached it a shell fell out on the floor, just one fell out."

On cross examination Mrs. Martin testified that defendant had eaten breakfast there twice that week; that he usually came after he had carried Betty (deceased) to work and he and the baby would eat breakfast together.

Witness testified she did not hear defendant scream (the baby was screaming), nor did she hear him say anything after the shooting except that it was an accident. She did not hear defendant say he did not know it was loaded. She also testified that at that time there was no vase on the mantel with shells in it.

Donald Griffin, a brother of deceased, testified for the State. He was living in the home when the shooting occurred, but was not there at the time. That the rifle exhibited belonged to him and that he obtained it about the last of May when school was out. He kept it in room No. 5 with the shotgun on a rack on the wall above the bed. The barrel was toward the head of the bed. The rack was two or three feet above the bed. That after he used the rifle the last time he took it apart, cleaned it and put it on the rack; and it was not loaded. That was immediately prior to August 5th of that year. That he had one twenty-two shell on a shelf and had a few thirty-eight bullets. That the twenty-two shell was a long. He had bought only one box of twenty-two shells since he got the

rifle. That the twenty-two shell on the shelf was one he had had a "pretty good while", and was not one of those he had bought; and he knew of no other twenty-two bullets in the house. Knew of none in a vase in Mrs. Martin's room (No. 3). That he had not taken the rifle off the rack after he cleaned it and it was unloaded when he put it up.

On cross examination Donald testified he did not have the twenty-two cartridge on the sewing machine in front of the bed in room No. 3. Never had any around the sewing machine. That Harold looked at the rifle about a month and a half before that time out in front of the house while with deceased who was sitting on the porch. Defendant wanted to swap stocks with the witness. The rifle was not then loaded. It held about sixteen long twenty-two bullets. Witness had shot longs in it but not shorts and never shot any but the one box of longs. The bullet he had on the what-not was not out of that box and was a long. He had a collection of this twenty-two, one thirty-eight and a German "luger": no other kind. He never had any shells in Mrs. Martin's button bowl. Witness had never seen Harold look at the rifle at any other time. He had been using his cousin's rifle and this shell (a twenty-two) had been left. Witness testified he did not tell some boys at the barber shop that he had some ammunition and they could kill a crane if they wanted to. The shotgun was not loaded. The shotgun shells were on the what-not, not in the dresser or chifferobe drawer. Witness thought the officers got a twenty-two rifle bullet from Mrs. Martin's dresser drawer, but he did not know of them getting one anywhere else. That he had the rifle on a camping trip on Shocco Mountain and had returned about two weeks before. The other boys had rifles and shells. They shot about fifty cartridges on that trip. When he got home from the trip he had none of those twenty-two longs and brought no cartridges home from that trip. In cleaning the rifle he left the magazine in it: he pulled the slide back and looked in the gun to see if it was loaded, and it was unloaded.

Dr. Hardwick testified for the State that he saw deceased, Betty, at the hospital the day she was brought there, about 9 o'clock in the morning. She was alive and defendant was with her. Witness found a small gunshot wound to the left and above the navel. The wound was made by a small caliber gun of some kind. In the emergency room she was in profound shock, groaning, but unconscious. Later he operated on her and was with her almost constantly until she died. Within twenty minutes while in the operating room she began getting better and was conscious, but was in much pain, and she started talking. Later she went into complete shock.

Defendant made offer of proof by the doctor that he found defendant in shock and gave him narcotics, to which objection was sustained without error.

Walton Haynes, a witness for the State, was a policeman. He and policeman Beverley went to the Griffin home at 9:00 or 10 o'clock on August 5th on call. There were several people there. Mrs. Martin turned over to them one Stevens model twenty-two rifle. The rifle was loaded with only one shell—a long—in the barrel. None in the magazine. She also turned over to him an empty shell. The rifle remained in his custody until he turned it over to Dr. Sowell at 1:30 or 2:00 o'clock that night, August 5th, together with the cartridge hull turned over to witness by Mrs. Martin, also the twenty-two long shell. All were turned over to Dr. Sowell. An empty shell was in the rifle when Mrs. Martin gave it to him. Mrs. Martin got the bullet (empty shell) she gave the officer from on the floor of the back bedroom. This was the fired cartridge in front of the bed. She got the twenty-two rifle shell from off the top of the dresser. The rifle had one shell in the barrel.

Walter Griffin, witness for the State, testified that he was the father of Betty, deceased. That during the week previous to August 5th she spent two nights at his home: one was Friday before the next Thursday when she was shot. Witness went to her house on Friday afternoon: Betty was there when he arrived and when he left. He saw her later that night as she

spent the night at his home. Harold came to the home of the witness some time after 1:00 that night. He went into Mrs. Martin's bedroom and stayed there about three minutes. He then came out and got in the car and went home. Betty stayed at her father's home and did not leave. On Saturday Betty and Mrs. Griffin (her mother) went to Betty's house. Witness next saw deceased that afternoon in front of his house on the street. Harold was not with her. Witness later saw her that night about 8:00 o'clock in the car with Harold at her home. City officers went with the witness and he went in the house. Betty and defendant were there. Witness stated, "I told her (Betty) I had come after her and the car". Harold made reply, "If you did, there will be serious trouble", to which witness replied, "What more trouble could there be, he had threatened to kill her and beat her up". Motion to exclude was overruled, but there was no objection to the question. Defendant replied "I didn't", and Betty said "Why, Harold, you did, and showed a place on her leg where he had hit her". (The motion to exclude overruled, with no objection to the question.) When Betty left her home that night with witness, Harold said, "You had better be back here tonight." Betty spent the night at the home of the witness. (The court excluded evidence as to bruises and her statement that he hit her, because he denied doing so.) The witness testified that Betty spent the nights of Friday, Saturday, Sunday, Monday, Tuesday and Wednesday, (Thursday was August 5, 1954) at the home of witness, her father. That on one occasion, several weeks before August 5th, defendant and some men drove up and stopped in front of witness' home about 4 o'clock in the afternoon, and defendant asked where Betty was, and "I told him I hadn't saw her. He said he was going to beat the devil out of her". Objection was overruled and exception noted.

On cross examination witness testified that defendant and Betty had not always been congenial and devoted. Betty spent the night with defendant Thursday night of the week before; and on Sunday night before Thursday, August 5th, she took the baby to see defendant. That defendant and Betty continued to live together at times. They were not congenial, and they had been having trouble ever since the baby was born —twenty-two months. The baby was born November 19, 1952. Defendant was in the Army but was home for thirty days when the baby was born. Right after that he was sent overseas for about a year.

Mrs. Griffin, witness for the State, testified that Betty spent the Friday night before August 5th at her home; that she went by and picked her up. That defendant came there about 1 o'clock in the morning and got the car key—Betty did not leave with him. That she spent Saturday night there also, but not Sunday night. That Betty spent the nights of Monday, Tuesday and Wednesday at witness' home. Witness and her husband went over to Betty's home Saturday night and witness got the police to go with them.

Appellant insists that the burden of proof is on the State to prove beyond a reasonable doubt that defendant intentionally killed his wife Betty. The argument is that the evidence is insufficient to justify a finding that defendant intentionally caused her death or intended to do her great bodily harm with the weapon used. It is not questioned that if he voluntarily inflicted the wound it was with a deadly weapon, and unless the evidence rebuts the presumption of malice, it may be inferred from such use of a deadly weapon. That is of course the well established principle settled in this State. Hornsby v. State, 94 Ala. 55, 10 So. 522. A man must be taken to intend that which he does or which is the immediate or necessary result of his act. Meredith v. State, 60 Ala. 441.

The Hornsby and Meredith case, supra, and others presuppose a voluntary act without a specific intent to take life. Another principle is that the law will imply that the firing of a deadly weapon was intentionally done in the absence of any proof, positive or circumstantial, that it was accidental. But "if there is any evidence from which it might be inferred that the shooting was accidental, then the question.

of intent or will would necessarily be a question for the jury, and the court could not instruct them that the will to do the act did or did not exist". Oliver v. State, 17 Ala. 587(8), 602. Cf. Kitchens v. State, 251 Ala. 344, 37 So.2d 428.

The exclamation of defendant was a part of the res gestae, "I have shot Betty, but it was an accident, so help me God", served to withdraw the presumption that it was voluntarily done, but it is not sufficient to prevent that from being a matter of inference for the jury from all the facts and circumstances. Fowler v. State, 161 Ala. 1, 49 So. 788; Brown v. State, 142 Ala. 287 (3 and 4), 38 So. 268; Clements v. State, 50 Ala. 117.

All relevant evidence is admissible on that issue. Threats by defendant to do harm to Betty, assaults previously made, their conduct and general attitude toward each other tend to shed light on that issue. The defendant's motion to strike all the evidence at the conclusion of the case made by the State was, we think, properly overruled. It was a question for the jury whether the shot was intentionally fired at Betty, and whether it was maliciously done and was with premeditation and deliberation and without justification or mitigation.

The threats alleged to have been made by defendant that he would "beat the devil out of her" (Betty) several weeks before the shooting as well as their general relations toward each other, good or bad, were admissible on the question of whether the shooting was intentional or accidental. Kitchens v. State, supra; Hall v. State, 208 Ala. 199(3), 94 So. 59; Hudson v. State, 61 Ala. 333. Evidence of actual cruelty by defendant upon his wife prior to the shooting was admissible for that purpose. Spicer v. State, 188 Ala. 9(3), 65 So. 972. Likewise evidence of threats by defendant to kill and beat Betty made a few days before she was shot was admissible. Ex parte State, 181 Ala. 4(1), 61 So. 53; Rains v. State, 88 Ala. 91, 7 So. 315. The court committed no error in respect to those matters.

On cross examination Walter Griffin, father of Betty and a witness for the State, testified that defendant and Betty were not congenial or devoted to each other, and to the same effect on redirect examination. Defendant proved by Marion Nix that he and his wife were friends of defendant and his wife Betty; had known them six years, exchanged visits with them at home, went out with them, and that such relation continued after the baby was born. That they never saw defendant strike Betty nor threaten to do so, and further they never saw him in a fit of anger or temper with her. The State moved to exclude this evidence. The court sustained the motion and excluded it. The court also sustained objection to the proposed testimony of Betty Nix, wife of Marion Nix, that she was a good friend of Betty Shiflett, deceased. She testified that she had known defendant and his wife Betty for six years and exchanged visits with them. She then offered to testify on question by defendant that, after the baby was born, she never saw defendant strike Betty, and that she never saw or heard of either of them abusing or mistreating the other. The court refused to allow this testimony. The same nature of proof was offered by other witnesses. Defendant was privileged to prove that they were congenial or devoted, not because it was opposed to what defendant brought out from the witness Walter Griffin but because it was material on the question of whether the shooting was accidental or intentional. Kitchens v. State, supra.

Defendant was entitled to have this testimony to support his contention that the shooting was accidental. It was error to deny him the benefit of such evidence. But there was no error in refusing to allow Mrs. Nix to testify that on the night of August 5th and on August 6th, after the fatal shooting she went into room No. 3 (Mrs. Martin's room) and that there were twenty-two caliber shells in a bowl on the mantel. Donald Griffin and Mrs. Martin had testified that prior to the shooting there was only one such shell turned over to the officers. This proposed testimony did not relate to the same time and was not competent.

344

■ Mrs. Griffin was asked by defendant on cross examination whether Walter Griffin told Betty on Wednesday before Thursday August 5th "for her to stay away from Harold and not be going out with him". This was offered as stated to the court to "show interest, prejudice or bias" of Walter Griffin as a witness who had testified for the State. The same was offered as occurring on Thursday August 5th before he went to work. The court sustained the objection of the State to this evidence, and defendant excepted. We think it should have been admitted for the purpose for which it was offered.

■ At a time when death was impending and when Betty became conscious before she was operated on, she asked the doctor if she was going to die. He told her he did not believe she would, that he thought she was going to pull through. There was no evidence that she thought she was about to die or that death was impending. The doctor asked her to tell him how all this happened. Objection was made by the State. Defendant offered to prove that she said "Dr. Hardwick, I don't believe Harold meant to do it". The court refused to admit the evidence on objection by the State. This evidence was not admissible, although it was a statement by deceased after she had received a mortal wound. It was not a dying declaration and did not tend to contradict any part of a dying declaration. Spicer v. State, 188 Ala. 9(8), 65 So. 972; Cotney v. State, 248 Ala. 1, 26 So.2d 603.

■ There was not sufficient evidence to support a finding that the statement made by Betty to Dr. Hardwick, which the defendant offered to prove, occurred immediately upon her first becoming conscious after having been rendered unconscious instantly by the shooting. So that, the evidence does not justify an application of the principle stated as follows in 30 Am.Jur. 568, section 672:

"The declarations of a party injured in an accident by which he was rendered unconscious, made immediately upon his regaining consciousness, are viewed by some courts as much a part of the occurrence, as if they had been made immediately after the accident. Thus, statements made by one rendered unconscious by a personal injury, immediately upon his regaining consciousness eight days later, as to the cause of the injury are clearly admissible as part of the res gestae, with the same effect as if they were made immediately after the injury was sustained. The fact that declarations are made in response to questions of an attending physician when such injured person is first restored to consciousness will not, according to this view, affect the admissibility of such statements. However, there is also authority for the view that such statements are not admissible as part of the res gestae."

A like statement is found in 32 C.J.S., Evidence, § 419, page 52. We cannot say at this time from the record whether the statement alleged to have been made by Betty to Dr. Hardwick was a part of the res gestae upon the principle supra.

For the errors pointed out above, the judgment should be reversed and the cause remanded for another trial.

The foregoing opinion was prepared by Foster, Supernumerary Justice of this Court, while serving on it at the request of the Chief Justice under authority of Title 13, section 32, Code, and was adopted by the Court as its opinion.

Reversed and remanded.

LIVINGSTON, C. J., and LAWSON, STAKELY and MERRILL, JJ., concur.