On Application for Rehearing

SHAW, Judge.
The opinion of August 30, 2002, is withdrawn and the following opinion is substituted therefor.
The appellant, A.C.M., was convicted of rape in the first degree, a violation of § 13A-6-61, Ala.Code 1975.[1] He was sentenced, as a habitual felony offender, to fife imprisonment.
The appellant raises two issues on appeal. First, he contends that the trial court erred in denying his motion to suppress evidence of hearsay statements made by E.R., the victim in this case, approximately seven hours after the rape because, he says, those statements did not fall within the excited-utterance exception *573 to the hearsay rule. See Rule 803(2), Ala. R.Evid. Second, he contends that without E.R.’s hearsay statements, the evidence was insufficient to sustain his conviction.
The evidence adduced at trial indicated the following. In the late morning hours of June 14, 1999, S.F., the son-in-law of E.R., saw E.R. walking down the street near her home with a towel wrapped around her neck. S.F. testified that E.R. motioned to him with her finger to come to her, and that when he got to her, E.R. pulled the towel away from her neck, and he saw that her throat had been cut. According to S.F., the cut on E.R.’s throat was so deep that he “could see her vocal ... cord.” (R. 128.) S.F. testified that E.R. was weak, that she fell to the ground, and that he then got his wife, E.R.’s daughter, and they telephoned for help.
J.S. Daniel, a corporal with the Montgomery Police Department who responded to the emergency call, testified that when he arrived at the scene E.R. was sitting in the passenger seat of a vehicle holding a towel around her throat. Cpl. Daniel asked E.R. to remove the towel so that he could see the cut, and she did so. Cpl. Daniel said that the cut on E.R.’s throat was so deep that her windpipe was exposed and that, therefore, she was unable to speak. Cpl. Daniel nevertheless attempted to question E.R. about what had happened. Cpl. Daniel testified that when he asked E.R. if she had been raped, she nodded her head in the affirmative; when he asked E.R. if the rapist was a family member, she shook her head in the negative; when he asked E.R. if the rapist was someone she knew, she nodded her head in the affirmative; and when he asked E.R. if the rapist was her ex-husband, she shook her head in the negative. Cpl. Daniel testified that, despite her injuries, E.R. “seemed to have her senses about her” (R. 135), and that, in his opinion, she understood his questions and “answered each question knowledgeably.” (R. 143.)
When the paramedics arrived, they transported E.R. to the hospital, where Dr. Neil Stronach treated her. Dr. Stro-nach testified that E.R.’s windpipe had been “cut all the way through” (R. 101), and that she had a laceration to the jugular vein, which was the source of most of her bleeding. He said that the cuts had been caused by a sharp instrument. Dr. Stronach stated that, by the time E.R. arrived at the hospital, she had lost a lot of blood, her blood pressure was low, she was unable to breath on her own, and she was in severe shock. He said that normally the injuries E.R. had received would have caused death in approximately 15 minutes, but that in E.R.’s case, two factors had slowed the bleeding process and had probably saved E.R.’s life: E.R. had been lying down so most of the blood she had lost had not gone down her windpipe, and E.R. had a preexisting heart condition which prevented her heart from pumping blood as rapidly as it should. On cross-examination, Dr. Stronach testified that because E.R. had been in a severe state of shock when she arrived at the hospital, he believed that her ability to reason was impacted when he saw her. He also stated that she had lost approximately 60% of her blood volume and that that type of blood loss would impact a person’s sensory perceptions. The appellant’s counsel then posed the following question:
“[Appellant’s counsel]: Okay. So say an hour prior to this, if we assumed that the blood loss had — was significant an hour before you saw [E.R.], but not a whole lot more significant an hour later when you first saw her, would you say that her sensory perception would have been impaired, her ability to hear, reason, think, respond correctly, appropri *574 ately? Would her — would those functions be impaired?
“[Dr. Stronach]: Yes, sir.”
(R. 113-14.)
Testimony indicated that, at the time of the crime, the appellant had been living with E.R.’s other daughter off and on for approximately eight years and that the appellant and E.R. did not get along. E.R.’s daughter testified that the appellant had called E.R. a “bitch”; had told her that E.R. was jealous of their relationship; and had said that he hated E.R. (R. 152-53.) E.R.’s daughter also testified that she saw the appellant on the night of June 13, 1999, at approximately 10:30 p.m., when she went to bed. She did not see him again until the next morning at 10:00 a.m., when she got up and found him sleeping on the couch. Testimony also indicated that on the night of the crime, the appellant had been looking for E.R. C.L., who lived down the street from E.R., testified that at approximately 3:00 a.m. on June 14, 1999, the appellant had knocked on his front door and had asked him where E.R. lived.[2] C.L. told the appellant that he did not know where E.R. lived, and the appellant then left.
Guy Naquin, a homicide detective with the Montgomery Police Department, testified that he investigated the attack on E.R. When he went to E.R.’s residence, he found dried blood on the living-room floor, articles of clothing with blood on them in the living room, a bloody towel in the bathroom, and a black-handled kitchen knife in the kitchen sink next to a sponge. His investigation eventually led him to the appellant, whom he interviewed on July 2, 1999. Before questioning the appellant, Det. Naquin advised the appellant of his Miranda[3] rights, and the appellant signed a waiver-of-rights form. The appellant initially told Det. Naquin that he had been having sexual relations with E.R. for a long time and that he had had sex with her at her residence at approximately 4:00 a.m. on June 14, 1999, after which he had gone home. The appellant told Det. Naquin that E.R. had been fine when he had left her that morning. When Det. Naquin asked the appellant how he could have been having sexual relations with E.R. on a regular basis when he had not known where E.R. lived, the appellant changed his story. The appellant then said that he had had sexual relations with E.R. before she moved to her present residence but that he had not had sex with E.R. since she had moved. Testimony indicated that E.R. had moved three to four months before the rape. Det. Naquin also testified that the appellant told him that when he had seen on a television newscast that he was wanted concerning the rape, he had fled to New York to avoid arrest. On cross-examination of Det. Naquin, the following occurred:
“[Appellant’s counsel]: ... Well, you don’t recall him telling you that — ad-vis[ing you] that he had not had sex with [E.R.] in her new residence where she is now living? You don’t recall that—
“[Det. Naquin]: Yes, he did say that.
“[Appellant’s counsel]: He did say that?
“[Det. Naquin]: Yes.
“[Appellant’s counsel]: And he also told you that he didn’t know where her new residence was, didn’t he?
*575 “[Det. Naquin]: Yes, he did say that.”
(R. 194.)
The parties stipulated that a rape kit had been performed on E.R. in the hospital on June 14, 1999, and that DNA analysis had revealed that the vaginal swabs taken as part of that kit contained the appellant’s semen. The parties also stipulated that E.R. died before trial from a preexisting condition unrelated to the rape.
The appellant contends that the trial court erred in denying his motion to suppress Cpl. Daniel’s testimony regarding E.R.’s hearsay statements made in response to his questions at the scene because, he says, those statements did not fit within the excited-utterance exception to the hearsay rule. Specifically, he argues that E.R.’s statements did not qualify as excited utterances because, he says, (1) they were made approximately seven hours after the rape; (2) they were made in response to questions by Cpl. Daniel; and (3) E.R. was in such a state of shock when she made the statements that she was unable to comprehend what was being asked of her.
Rule 803, Ala.R.Evid., provides, in pertinent part:
“The following are not excluded by the hearsay rule even though the declar-ant is available as a witness:
“(2) Excited Utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.”
Charles Gamble has stated the following regarding Rule 803:
“This rule sets out three conditions which must be met for admission of the statement. There must be a startling event or condition, the statement must relate to the circumstances of the occurrence and the statement must be made before time has elapsed sufficient for the declarant to fabricate. The statement must be the apparently spontaneous product of that occurrence operating upon the visual, auditory, or other perceptive sense of the speaker. The declaration must be instinctive rather than deliberative. In short, it must be the reflex product of the immediate sensual impressions, unaided by retrospective mental action. Whether a statement qualifies as an excited utterance is a preliminary and discretionary question for the trial court.”
Charles W. Gamble, McElroy’s Alabama Evidence § 265.01(1) (5th ed.1996) (footnotes omitted). “The question of whether the statement is spontaneous in a given case is to be decided upon the facts and circumstances of that case, and such determination is a question for the trial court.” O’Cain v. State, 586 So.2d 34, 38 (Ala.Crim.App.1991). See also Berryhill v. State, 726 So.2d 297 (Ala.Crim.App.1998).
“The Alabama Supreme Court, very early on, described the essential element when it observed that admissibility under the present exception
“‘depends upon whether the circumstances are such as that it may with reasonable certainty be affirmed that the declarations were produced by and instinctive upon the occurrences to which they relate rather than a retrospective narration of them. If they are the ebullition of a state of mind engendered by what happened and not a mere statement of the facts as held in memory of a past transaction — if they were made so soon after the difficulty as that, under the particular circumstances transpiring between the difficulty and the declara *576 tions, it is reasonably clear that they sprang out of the transaction.’
“This decision made it clear that a statement, to be admissible within the present exception, must be made while the declarant is under the stress of excitement caused by the event or condition. The essence of this historic requirement is found in the word ‘spontaneous.’ The trial court, in determining whether the statement was made spontaneously or during the stress of excitement, ought to consider at least the following: the degree of startlingness of the occurrence; how much time passed after the occurrence but before the statement was made; the effect of intervening events; the nearness of the place where the statement was made to the place of the occurrence; the condition of the declar-ant; the content of the statement itself; and all other facts relating to whether the declarant was under the stress of a nervous excitement at the time the statement was made.
“One of the primary factors, in any determination of whether the declarant was under the stress of excitement when the statement was made, is the timing of the statement.... The lapse of time between the startling event or condition and the statement is relevant to the issue of spontaneity but not dispositive of it. The better approach to this problem, however, is suggested by those decisions which have held that the question of spontaneity is to be decided upon the facts and circumstances of each individual case and such a determination is a question for the trial judge....
“It should be kept in mind that strict contemporaneity should not be required between the statement and the occurrence in order for the declaration to qualify for the present hearsay exception. Indeed, our courts have said that time alone is not a determining criterion and that applicability of this exception cannot be decided upon the basis of any specified time or number of minutes between the act and the declaration. The critical factor is whether the person who made the statement is still under the influence of the emotions arising from the startling event. Stated differently, the statement does not have to be made contemporaneously with the startling event or condition but it must be uttered contemporaneously with the excitement resulting from the startling event or condition. How long the excitement prevails is largely determined by the character of the event or condition.”
Gamble, § 265.01(2), quoting Nelson v. State, 130 Ala. 83, 88, 30 So. 728, 730 (1901)(footnotes omitted).
In this case, approximately seven hours elapsed from the time of the “startling event” and E.R.’s statements to Cpl. Daniel. However, it appears from the record that E.R. was unconscious during much of that time. At the pretrial hearing on the appellant’s motion to suppress, the parties discussed a statement E.R. had given to police several days after the rape[4] in which E.R. indicated that after the appel *577 lant had raped her, he choked her until she was unconscious; that when she woke up, she was lying in a pool of blood; and that she left her house and sought help immediately after regaining consciousness and discovering that her throat had been cut.[5]
“Declarations made immediately upon regaining consciousness by a party injured in an accident by which he was rendered unconscious are viewed by most courts as being as much a part of the occurrence as if they had been made immediately after the accident. According to these courts, the period of unconsciousness is not to be taken into consideration in determining the question of spontaneity as affected by the lapse of time. The real test is whether the circumstances exclude premeditation and design. The fact that declarations are made in response to questions of an attending physician when such injured person is first restored to consciousness will not affect the admissibility of such statements, although it is a factor entitled to consideration.”
29A Am.Jur.2d Evidence § 886 (1994)(foot-notes omitted). See also Shiflett v. State, 262 Ala. 337, 78 So.2d 805 (1955). Thus, that portion of the time between the attack and E.R.’s statements to Cpl. Daniel during which E.R. was unconscious should not be considered in determining the spontaneity of her statements. Although the statements to Cpl. Daniel were made approximately seven hours after the attack, they were made only a few minutes after E.R. regained consciousness.
Moreover, “the fact that the utterance was the result of a question is merely a factor to be considered in determining whether the statement was made while the declarant was under the stress of excitement.” Gamble, § 265.01(3) (footnote omitted). “[A] statement made in response to a question is admissible as a spontaneous exclamation if the person answering was still under the influence of the excitement or shock of the crime.” O’Cain, 586 So.2d at 38. Thus, although the fact that the statements were made in response to questioning by Cpl. Daniel was a factor to be considered, it was not dis-positive of the admissibility of the statements, especially under the circumstances in this case. As noted above, Dr. Stronach testified that E.R.’s windpipe had been cut all the way through, Cpl. Daniel testified that her windpipe was “exposed,” and both testified and that she was unable to speak; physical gestures were her only means of communicating. Such gestures would be best understood when made in response to questions.
Finally, the condition of the declarant at the time of the statements is also a factor to be considered in determining the admissibility of the statements; however, -it is, like the other factors, not alone dispositive of the issue. As noted above, Dr. Stronach testified that when E.R. arrived at the hospital she was in a severe state of shock because of a significant loss of blood, and that her ability to reason was impacted. *578 However, contrary to the appellant’s contention in his brief to this Court, Dr. Stro-nach never testified that “the victim was in a severe state of shock at least one hour prior to his examining her.” (Appellant’s brief at p. 14.) Rather, in response to a hypothetical question posed by the appellant’s counsel, Dr. Stronach testified that if it was assumed that the amount of blood loss was significant an hour before E.R. arrived at the hospital (i.e., at the time she made the statements to Cpl. Daniel) and no more significant when she arrived at the hospital — i.e., that the majority of her blood loss occurred before she spoke with Cpl. Daniel and she had lost little or no more blood between the time she spoke with Cpl. Daniel and the time she arrived at the hospital — then her ability to reason, to think, and to respond appropriately would have been impaired an hour before she arrived at the hospital. However, there was no evidence indicating that the majority of E.R.’s blood loss occurred before she spoke with Cpl. Daniel. In fact, the evidence at trial suggests that the majority of the blood loss occurred between the time E.R. regained consciousness — only a few minutes before she spoke with Cpl. Daniel — and the time she arrived at the hospital. Dr. Stronach stated that it was, in part, E.R.’s horizontal position after the attack that prevented her from dying in less than 15 minutes, thus indicating that a significant amount of the blood loss did not even begin to occur until a few minutes before E.R. spoke with Cpl. Daniel, when she regained consciousness, got up, and began walking around. Moreover, Cpl. Daniel testified that when he questioned E.R., she “seemed to have her senses about her” and that she “answered each question knowledgeably” (R. 135, 143), and the record reflects that E.R. answered both “yes” and “no” to Cpl. Daniel’s various questions, thus demonstrating an awareness of the nature of the questions.
Considering that E.R. regained consciousness after the attack to discover that while she was unconscious her throat had been cut to the degree that her windpipe was severed; that although approximately seven hours passed between the attack and E.R.’s statements to Cpl. Daniel, E.R. was actually unconscious during most of that time and there were no intervening events; that E.R. made the statements to Cpl. Daniel just outside of her house where the attack had taken place; and that, despite bleeding profusely, E.R. nevertheless had her “senses about her” and answered Cpl. Daniel’s questions and indicated that she had been raped by someone she knew, we conclude that E.R. was still under the stress of excitement caused by the attack at the time she made the statements to Cpl. Daniel and that, therefore, her statements were properly admitted under the excited-utterance exception to the hearsay rule.
The appellant also contends that, without E.R.’s allegedly inadmissible statements to Cpl. Daniel, the evidence was insufficient to sustain his conviction for rape. Because we have already determined that E.R.’s statements were properly admitted, however, we must consider them, along with all of the other evidence, in determining whether there was sufficient evidence to sustain the appellant’s conviction.
“Tn determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution.’ ” Ballenger v. State, 720 So.2d 1033, 1034 (Ala.Crim.App.1998), quoting Faircloth v. State, 471 So.2d 485, 488 (Ala.Crim.App.1984), *579 aff'd, 471 So.2d 493 (Ala.1985). “ ‘The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt.’ ” Nunn v. State, 697 So.2d 497, 498 (Ala.Crim.App.1997), quoting O’Neal v. State, 602 So.2d 462, 464 (Ala.Crim.App.1992). “ “When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court’s decision.’” Farrior v. State, 728 So.2d 691, 696 (Ala.Crim.App.1998), quoting Ward v. State, 557 So.2d 848, 850 (Ala.Crim.App.1990). “The role of appellate courts is not to say what the facts are. Our role ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury.” Ex parte Bankston, 358 So.2d 1040, 1042 (Ala.1978).
Viewing the evidence in the light most favorable to the State, we conclude that it was sufficient to sustain the appellant’s conviction. E.R.’s throat was cut, and she told Cpl. Daniel that she had been raped by someone she knew. The evidence showed that E.R. knew the appellant; that the appellant did not get along with E.R.; and that the appellant had been looking for E.R. on the day of the crime. The appellant’s semen was found on the vaginal swab taken from E.R. in the hospital. When the appellant discovered that he was wanted in connection with the rape, he fled the state. See, e.g., Ex parte Jones, 541 So.2d 1052 (Ala.1989)(flight is evidence of consciousness of guilt). When eventually questioned by the police, the appellant initially told Det. Naquin that he and E.R. had been having sexual relations for a long period of time and that he had had sex with E.R. at her home on the morning of the crime. However, when he was confronted with evidence indicating that he had not known where E.R. lived, the appellant changed his story and told Det. Naquin that he had never had sex with E.R. in E.R.’s present residence. This evidence was sufficient to establish that the appellant raped E.R.
Based on the foregoing, the judgment of the trial court is affirmed.
OPINION OF AUGUST 30, 2002, WITHDRAWN; OPINION SUBSTITUTED; APPLICATION OVERRULED; AFFIRMED.
McMILLAN, P.J., and COBB, BASCHAB, and WISE, JJ., concur.

. He was also indicted for attempted murder of the same victim; the jury acquitted him of that charge.

. The appellant did not use E.R.'s name when asking about her, but used a nickname. Testimony at trial showed that the nickname the appellant used when asking C.L. where E.R. lived was, in fact, E.R.’s nickname.

. See Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Rule 1101(b)(1), Ala.R.Evid., provides, in part, that the rules of evidence do not apply to "[t]he determination of questions of fact preliminary to admissibility of evidence when the issue is to be determined by the court under Rule 104.” Rule 104(a), Ala.R.Evid., provides, in pertinent part, that "[p]reliminary questions concerning ... the admissibility of evidence shall be determined by the court,” and that "[i]n making its determination, [the court] is not bound by the rules of evidence except those with respect to privileges.” Therefore, the trial court could, and clearly did, consider E.R.'s statement to police several days after the attack in determining the admissibility of her statements to Cpl. Daniel.

. It appears from the record that a portion of E.R.’s statement was recorded. A transcript of the recorded portion of the statement is included in the record on appeal. In that transcript, E.R. stated that after the appellant had raped her, he choked her until she was unconscious, and that when she woke up, she was lying in a pool of blood. The transcript does not reflect that E.R. stated that she immediately left her house and sought help after regaining consciousness. However, a police report prepared by the officer who took the statement, which summarizes E.R.’s statement, specifically states that E.R. told him that "she woke up several hours later in a pool of blood, went to the bathroom, and saw that her throat was cut. She stated she then staggered outside and summoned help.” (C. 59.)