THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* ARTHUR PERRY, Appellant.

Argued March 3, 1938; decided April 12, 1938.

C. *Hutchley Riley* and *Henry P. Lipscomb* for appellant. The court erred in permitting improper and prejudicial cross-examination and rebuttal evidence by itself and by the District Attorney. (*People* v. *Rosenzweig*, 265 N. Y. 323; *People* v. *Slover*, 232 N. Y. 264; *People* v. *Freeman*, 203 N. Y. 267; *People* v. *Malkin*, 250 N. Y. 185; *People* v. *Crapo*, 76 N. Y. 288; *People* v. *Irving*, 95 N. Y. 541; *People* v. *Tice*, 131 N. Y. 651; *People* v. *Webster*, 139 N. Y. 73; *People* v. *Michor*, 226 App. Div. 569; *People* v. *Rutigliano*, 261 N. Y. 103; *People* v. *Dolce*, 261 N. Y. 108.) The rights of the defendant were violated in admitting rebuttal testimony to contradict

collateral matters. (*People* v. *De Gamo,* 179 N. Y. 130; *People* v. *Figaro,* 218 App. Div. 638; *People* v. *Dietz,* 216 App. Div. 23; *People* v. *Malkin,* 250 N. Y. 185; *People* v. *Balen,* 241 App. Div. 422.) The court erred in admitting prejudicial, incompetent evidence on the theory that it tended to prove motive. (*People* v. *Creasy,* 236 N. Y. 205; *People* v. *Bennett,* 49 N. Y. 137; *People* v. *Fitzgerald,* 156 N. Y. 253; *People* v. *Harris,* 136 N. Y. 423; *Manning* v. *John Hancock Mut. Life Ins. Co.,* 100 U. S. 693; *United States* v. *Ross,* 92 U. S. 281; *Lamb* v. *Union Ry. Co.,* 195 N. Y. 260; *People* v. *Razezicz,* 206 N. Y. 249.) It was error to offer in rebuttal the letter purporting to have been written by deceased to her mother. (*People* v. *Creasy,* 236 N. Y. 205.) The court erred in its charge to the jury and refusal to charge as requested by defendant. (*People* v. *Barberi,* 149 N. Y. 256; *People* v. *Velleman,* 247 App. Div. 172; *People* v. *Morelli,* 243 App. Div. 587; *People* v. *Razezicz,* 206 N. Y. 249; *Lamb* v. *Union Ry. Co.,* 195 N. Y. 260; *People* v. *Barbato,* 254 N. Y. 170; *People* v. *Russell,* 266 N. Y. 147.)

*Charles P. Sullivan,* District Attorney (*John H. W. Krogmann* of counsel), for respondent. The guilt of the defendant was established beyond a reasonable doubt. (*People* v. *Gonzalez,* 35 N. Y. 49; *People* v. *Roach,* 215 N. Y. 592; *People* v. *Place,* 157 N. Y. 584; *People* v. *Cohen,* 223 N. Y. 406.)

RIPPEY, J. The defendant was convicted of the crime of murder in the first degree for the alleged killing of his wife late in the evening of July 1, 1936. The body was discovered at about seven-fifteen on the morning of July 2d lying on the ground at or near the corner of One Hundred and Fifty-seventh and Tuckerton streets, Jamaica, below the elevated tracks of the Long Island Railroad. The surroundings indicated the possibility of a struggle. Near the body were found a man's Oxford shoe and, about fifty feet away, a chunk of cement. When the body was

moved, an electric flat-iron was discerned and also an envelope containing an electric light-gas bill, three pictures, a memorandum book, and some miscellaneous slips of paper. The shoe, flat-iron and envelope and contents were the property of a man by the name of Palm. It was the theory of the People that the defendant had planted these articles at the scene of the crime to divert suspicion from himself to Palm, and a considerable portion of the trial was devoted by the prosecution to the establishment of Palm's innocence. The autopsy disclosed the cause of death as laceration and hemorrhage of the brain following a fracture of the skull, and medical opinion was produced to the effect that the skull fracture might have been caused by a blow from the electric flat-iron or from the chunk of cement.

The evidence by which the People sought to connect the defendant with the commission of the crime was purely circumstantial. Much reliance was placed by the prosecution upon expert testimony. We need not review it in detail and only pause to say that it was not of such a strong and convincing character as to permit the court to overlook errors prejudicial to the defendant during the conduct of the trial. The prosecution attempted to establish motive. To that end, it was claimed that the defendant committed the crime for the purpose of procuring the payment of a small sum from the Metropolitan Life Insurance Company on a policy which it carried on the life of the deceased. Evidence was introduced to indicate that the policy had lapsed a short time before the homicide and that on the day preceding the homicide the necessary premiums had been paid by an unidentified colored man to the company for the purpose of reinstating the policy, but there was no evidence that defendant had ever handled the policy or attended to the payment of the premium or that he was aware that the policy had lapsed or that he had paid the item which brought about its reinstatement and he

was not named as beneficiary in the policy. While the motive, if proven, was material, it was not established by the proofs and was purely speculative. " It cannot be imagined any more than any other circumstance in the case " (*People* v. *Fitzgerald*, 156 N. Y. 253, 258). *Prima facie*, defendant had no motive for killing his wife. They had apparently lived happily and were living happily together at the time of the homicide. The prosecution produced no evidence of quarrels between the parties, of animosity of the defendant toward his wife, or of any conduct on his part from which any inference of any such feelings could be drawn. No family difficulties were shown, no strained relations between them.

Defendant was taken into custody shortly before noon of July 2d and taken to a police station. Although he was questioned for many hours by different officers and also by an assistant District Attorney, and was charged by the detectives with the crime and efforts were made to procure a confession, there was no admission by the defendant nor any statement from him from which any inference might be drawn that he was involved in the crime. He denied any connection with the crime and gave explanations as to where he and his wife were the previous evening, why they were away from home, — his wife supposedly visiting her sister in preparation for a trip to South Carolina, and he, his relations in Brooklyn.

The defendant took the stand in his own behalf. Expert evidence was introduced to show that there were indications of blood in the sole of the shoe found at the scene of the crime. Palm testified that the shoes were his and that he had given them to the defendant some time prior to the homicide. The defendant testified that Palm had offered him the shoes some three weeks before his wife's death, that he had tried them on, that they were too short and that he had given them back to Palm. Officers testified that a pair of dark socks were removed from the feet of the defendant at the police station and

other evidence was introduced that there were blood stains on these socks, but the defendant denied that he had ever seen the socks, declared that he did not wear black socks and that they were not his. Defendaant testified in circumstantial detail concerning the movements of his wife and of himself on the day and evening preceding her death and gave testimony concerning matters important to his defense, of which no one else could know or testify. He denied that he had struck his wife or that he had seen her after about nine-thirty on the evening before her death when he saw her at the theatre and asserted he had no reason to wish for or cause her death. By his own evidence and by the evidence of others, he attempted to establish an alibi. His credibility became a most vital element in the case.

During the examination of defendant by the police officers on the day following the homicide, defendant mentioned a letter which he claimed that Palm had written to his wife, whereupon the officers took him to his sister's home and procured the letter. The defendant then testified, in answer to questions by his counsel, that after he procured the letter he gave it to the officers and they returned to the station house to the same room where he had previously been questioned. His counsel then asked him, " Q. Tell what took place then? A. Then after I got — After they got me back in the room, they started questioning me, started boxing me and kicking me around." The prosecuting officer objected. The court then took the questioning in hand and compelled the defendant to go over in detail the alleged abuse which he received from the officers and required the defendant to attempt to point out the officers in the courtroom. The subject was not followed up with questioning on that subject by counsel for the defendant. Early in the cross-examination of defendant the prosecution lined up various police officers in front of the defendant and asked him to

point out the officers who had misused him, and, following this, the court immediately took further hand in the proceedings and requested an additional officer to come forward and further interrogated the defendant. Counsel for the People was permitted to cross-examine the defendant at great length in regard to the alleged beating which he received from the police officers. Having thus brought out all the details of the alleged beating, the prosecution then proceeded to prove that his story was incredible. It appeared that he was taken before a magistrate for arraignment on the day after the questioning by the police officers had been finished and he was asked whether he told the magistrate that the police officers had struck him, to which he replied in the negative. He was then asked whether he told the warden of the jail to which he was taken after arraignment or any officer there that he had been beaten up by the police officers, and the defendant answered in the negative. He was then asked whether he had told the judge before whom he was arraigned to plead to the indictment that any police officers had beaten him up, and the defendant answered that he had not. He was also asked whether he had any doctor examine him, and he replied in the negative. The court, still unsatisfied with the cross-examination of the defendant upon this collateral issue, again began questioning the witness and pressed a number of questions as to whether he told the doctor at the city prison that he had been beaten up by the officers or as to whether he had told his own attorney about it and where. At this point the counsel for the defendant objected to any further questioning along this line on the ground that it was purely collateral and immaterial and there was no confession in the case and that it was entirely improper. The defendant's objection was overruled and the court continued the questioning. Various officers were called by the People on rebuttal who testified that they had not beaten up the defendant.

There was no connection between this testimony and the homicide. The only possible ground for the questioning was to destroy the credibility of the defendant. Of course, the defendant, having taken the stand, was subject to the usual tests for his credibility. While the extent of cross-examination was largely discretionary, nevertheless there is a limit to which discretion may be exercised, and there comes a time when improper cross-examination may constitute an error of law. In any event, the cross-examination being as to purely collateral matter, the District Attorney was bound by the answers adduced and was not entitled to contradict the testimony given by the witness (*People* v. *De Garmo*, 179 N. Y. 130). As in the *De Garmo* case, here " the effect of the incompetent evidence upon the defense is so apparent that it need not be discussed at length." (p. 135.) It need only be added that counsel for the People made much of the alleged impeachment of the defendant in his summary. He asked the jury whether they could believe the defendant as to the alleged beating in view of the testimony of the police officers and in view of the fact that the defendant.had only mentioned the beating once to Mr. Riley (defendant's counsel), that he had not told the lieutenant at the desk, that he had not told the magistrate when he was arraigned in court, that he had not told the warden in the jail, and that he did not " tell his Honor, Judge Colden, when he was arraigned here," that he was not attended by a doctor, and that all of the five officers in rebuttal had denied any such mistreatment. The court, in his charge, called the attention of the jury to the question of whether the defendant was telling the truth in regard to the beating. Although not in express words, by inference it was indicated that the fact defendant was beaten up, if true, was a material fact in the case. The court charged that if the jury believed any witness " including the defendant himself " had " testified willfully falsely as to any material fact in this case * * * you may disregard the entire testimony

of that witness, or you may accept so much as you believe to be true and reject that which you believe to be false." This charge was not, of course, erroneous. In view of what has been said, however, we cannot speculate that the jury may not have found that defendant testified falsely as to the alleged beating and that he was therefore entitled to no credit at all.

During the presentation of the People's case, a sister of the deceased girl was called to the stand and identified a letter as being in the handwriting of the deceased. The letter was thereupon marked for identification. Nothing more was heard of this letter until after both the People and the defendant had rested. Thereupon the District Attorney asked to be permitted to offer in evidence the exhibit in question " for the purpose of contradicting the cross-examination of this defendant." Objection was made to its introduction, was overruled, and defendant excepted. The opening which the District Attorney sought to use for the purpose of introducing this letter in evidence and thereby impeaching the defendant was brought out on his cross-examination as follows: " Q. Did you keep your wife well supplied with food and clothing during the time of your marriage? A. Did I keep her supplied? Q. That was the question. A. I did. Q. And did she ever complain to you that you were not supporting her? A. No, sir, she never complained to me." The letter was dated June 22, 1937, and was written by deceased to her mother in South Carolina. There was no evidence that the defendant had ever seen the letter prior to it being shown to him at the time of the cross-examination in question, and he denied that he knew who wrote it. The daughter's name was Shirley. Among other things the letter contained these statements: " I am up hear having little heart trouble but I am making it alright so if I can get my fair I am coming home next month and bring Shirly and Sis children for the summer we are up hear half naked and half starved and I can't go to work and tug

with Shirly because Arthur don't help me take her out and he expect me to stay home with her or I can't get around with her much. So I am going to bring her home so I can work and get me some clothes and Shirly some. All Arthur doing is working and eating it up by himself and the divil take us. Sis tell me she will help me with my fair and I will bring her children to stay until September when school open so I am just in a tough spot. Summer is hear now and overcoat can't hide them rags. I had Christmas so look for me next month, if nothing happens, and don't you worry about me because you didn't have no poor creater children Lucille and I go places now and enjoy our self and when I get interduced to any one I am Miss Brown (laugh) but I will be better if I get Shirly home Sis always keep her when I ready to go out. I spend from Saturday to Mond over in Brooklyn last week I always go to Bklyn when I get ready and stay long as I want to and dare him to say anything to me Arthur say he's going to write his on letter to you this week " The admission of the letter was erroneous and highly prejudicial.

The court incorrectly charged on the subject of alibi. It was not essential, as charged, that the alibi should cover the whole of the night during which the homicide occurred (*People* v. *Barbato*, 254 N. Y. 170). Other alleged errors have been called to our attention which we would feel compelled to consider were it not for the fact that the errors above discussed were so patently prejudicial that they cannot be overlooked.

The judgment of conviction should be reversed and a new trial ordered.

LEHMAN, O'BRIEN, HUBBS, LOUGHRAN and FINCH, JJ., concur; CRANE, Ch. J., concurs in result on the ground that the wife's letter was hearsay and incompetent.

Judgment of conviction reversed, etc.