39 So.2d 587

**LITTLE v. STATE.**

8 Div. 623.

Court of Appeals of Alabama.

Aug. 3, 1948.

Rehearing Denied Oct. 5, 1948.

R. L. Almon and Thos. Pettus, both of Moulton, and Hutson & Russell, of Decatur, for appellant.

A. A. Carmichael, Atty. Gen., and Richard S. Brooks, Asst. Atty. Gen., for the State.

CARR, Judge.

The appellant was convicted of murder in the second degree and sentenced to fifteen years imprisonment in the state penitentiary.

The deceased, Clifford Grigsby, was a share cropper of the accused. The evidence discloses that a misunderstanding arose over the landlord's contention that the tenant was not equally dividing some corn as it was gathered. This discord resulted in bad feeling between the parties and finally climaxed in the homicide of instant concern.

Questions are presented which call for a detailed statement of the tendencies of some of the evidence.

There were four eyewitnesses to the occurrences of the main event: Dalton Grigsby, a seventeen-year old son of the deceased; Neal Little, an adult son of the appellant; Dewey Oliver, who was about 50 or 75 yards away; and, of course, the defendant.

Oliver's testimony was given in the form of a written showing.

Young Little testified that he and his father had gathered corn during the forenoon and were returning to the corn field after lunch. His father had with him a sawed-off, double-barreled shotgun. When the couple had reached a point some distance from their home, the defendant, his son, and Oliver drove up to the barn near the house. After alighting from his car, the appellant called to the deceased to "wait there." Witness and his father stopped. The defendant and his son came up to about ten steps away, at which time the deceased said, "that was far enough." Appellant replied, "No, it wasn't far enough—that he had brought a hand over there to help gather the corn." Neal Little was by the appellant's side, and Oliver had stopped about 75 yards to the rear. At this point we quote from the record:

"A. My father told him he had his corn gathered, he was going to haul it in that

evening; Mr. Little told him he wasn't going to put it in that crib over there, and Neal Little said he wasn't going to get the mules and wagon to haul the corn, and my Daddy said, 'That's all right,' and Neal Little said, 'You haven't got guts enough to shoot no body.'

"Q. Neal Little told your father what, —go on? A. Father told him that was all right, and started walking on. Mr. Little hold him he wasn't going to put the corn in that crib up there, or he would shoot him.

"Q. Wasn't going to put it in that crib up there or he would shoot him? A. Yes, sir.

"Q. What happened then? A. He pulled his pistol out of his right-hand hip pocket.

"Q. Was it a pistol or a revolver? A. It was a pistol.

"Q. Then what happened? A. Father, he turned around and shot him, shot at Mr. Little.

"Q. When Mr. Little pulled the gun out of his pocket, your father turned around? A. Yes, sir.

"Q. What direction was your father facing at the time Mr. Little said that he couldn't put the corn in the crib or that he would shoot him? Was he standing there facing him, or walking away from him, or what? A. He was walking away from him.

"Q. When Mr. Little said that? A. Yes, sir.

"Q. And when he pulled his pistol out of his right-hand hip pocket? A. Yes, sir.

"Q. And then your father turned and fired on Mr. Little? A. Yes, sir.

"Q. Then what happened? A. Mr. Little shot twice, and father, he shot again, and Mr. Little shot, and he hit my father.

"Q. Your father shot once? A. Yes, sir.

"Q. Mr. Little shot twice? A. Yes, sir.

"Q. With a pistol? A. Yes, sir.

"Q. Then your father fired again? A. Yes, sir.

"Q. With a shot gun? A. Yes, sir.

"Q. And then Mr. Little fired again? A. Yes, sir.

"Q. Then what happened? A. Father fell.

"Q. Your father fell? A. Yes, sir.

"Q. How did he fall? A. On his face.

"Q. Face-forward? A. Yes, sir.

"Q. Did he drop the gun? A. Yes, sir."

The witness testified also that, after his father had fallen and was lying on his face, the defendant "stomped" him about three times on the back of the head.

With reference to the occurrence the testimony of the accused, which was supported in the main by his son and Oliver, was in substance as follows: That after the dispute about the distribution of the corn it was agreed that the appellant would furnish one person to help gather the grain; that on the occasion in question he had brought Oliver to serve in this capacity; that when he arrived the deceased and his son were about a quarter of a mile distant, out toward the field; that he called twice before Mr. Grigsby and his son stopped. For a full and accurate disclosure we here copy from his testimony:

"Q. You walked on towards him? A. Yes, sir, walked on up pretty close.

"Q. What do you mean 'pretty close'? A. I guess 6 or 8 or 10 feet.

"Q. He was standing there while you walked up towards him? A. Yes, sir.

"Q. Then what? A. I told him, 'Now I brought you the hand to help you gather the corn; just take the hand and go on and gather the corn any way you want to.' He says, 'I'm going to gather mine and you can do as you damn please about yours,' and I says, 'Well, I thought we agreed this morning that I would go ahead and bring a hand over here if I could get one,'—and we did; we agreed that I would bring one over there on Friday,—that was the day of the trouble. I didn't get a hand till 12 o'clock, but the understanding was that morning at the barn that if I didn't get one Friday, not to bring one till Monday morning; so I got one at 12 o'clock

and carried him over there just like I agreed, and he refused to use the hand.

"Q. Then what? A. I asked if he was going to do what he agreed to that morning when Mr. Earl Proctor was there.

"Q. What did he say? A. He didn't make any reply, but he stepped off some 5 steps.

"Q. Stepped off? A. Leaving, going East.

"Q. He turned his back to you and started off? A. Started towards the field. I started to turn around.

"Q. You started to turn around yourself, back towards the house? A. That's right, and he whirled around towards me and went to shooting. He shot me in the face, he shot twice. Both shots hit me— one shot here (indicating the left side of face), and the other shot over here (indicating right side of face), and 2 or 3 shots went through the lower part of my ear,—shot my hat brim off.

"Q. Have you got your hat here? A. Yes, sir, it's right out there in the car.

"Q. One load went on the right and one on the left? A. That's right.

"Q. You say he took 3 or 4 or 5 steps? A. Something like that.

"Q. Did he turn to the right or left when he shot you? A. He whirled around to the left.

"Q. Which way were you turning to go back to the car? A. I was turning to the right.

"Q. You turned to the right, and that made your left face to him? A. Yes, sir.

"Q. And he shot you in the face? A. Yes, sir.

"Q. What were you doing,—you said you was turning around,—what were you doing with your hands? A. I was just standing there like any body else would, I reckon, with my hands down.

"Q. Did you have anything in your hands? A. No, sir.

"Q. Did you have a pistol in your pocket? A. Yes, sir.

"Q. Which pocket? A. My right hip pocket.

"Q. He shot you the first time with that sawed-off shot gun, and hit you in the face,—what did you do then? A. I reached and got my gun as quick as I could.

"Q. Did you get your pistol? A. Yes, sir.

"Q. And fired it at him? A. Yes, sir.

"Q. Did you fire before he fired the second shot, or about the time he fired? A. If it isn't out of order, I would like to tell how it was.

"Q. Go on. A. When he shot me, he shot twice; there was just a cloud of smoke. I couldn't see him at all at that time, and this eye (left eye) was out.

"Q. You left eye was out? A. Yes sir, full of glass, and there was one or 2 shot here under the eye lid."

"A. There was a cloud of smoke between him and me, and I just fired in the direction he was standing; I couldn't see him.

"Q. You fired first about the time he fired the second shot? A. He fired 2 shots, and my first shot, I fired my first shot about the time of his second shot.

"Q. You shot how many times? A. 4 times."

The appellant denied that he "stomped" the injured man.

It is cogently urged in brief of counsel that the lower court should have granted appellant's motion for a new trial. The position is taken that the preponderance of the evidence leads to the inevitable conclusion that the circumstances incident to the killing disproved malice, and therefore a verdict of murder was not authorized.

In this jurisdiction it is a general rule of law that, within the province of appellate review, we are not expected to determine whether or not witnesses are deposing to the truth when they give evidence in the trial of a cause in the nisi prius court. This is a prerogative exclusively for the jury and the trial judge. The wisdom of the rule is evident. We have attempted to delineate the tendencies of the evidence to afford full review. To set out the applicable rules and collate the

evidence to these doctrines could serve no useful purpose.

Under facts in many respects analogous to those in the case at bar, the Supreme Court sustained a conviction for murder in the second degree in Underwood v. State, 179 Ala. 9, 60 So. 842. It is true that it is not indicated that a motion for a new trial was filed, but the tone of the opinion is clearly indicative of the mind of the court.

The facts and holdings in the case of Green v. State, 238 Ala. 143, 189 So. 763, are also compelling.

█ We entertain the view that in the case at bar we are not authorized to disturb the action of the trial judge in denying the motion for a new trial.

█ During the course of qualifying the prospective jurors on their voir dire, a number of them requested to be excused from service and stated their reasons therefor. Some of these were based on grounds which are recognized as legal by statute. In a few cases veniremen claimed physical handicaps. The court excused some; others were denied the request. Each juror was questioned with reference to these matters in the presence of the defendant and his counsel, and at the time the case was called for trial. The verity of the stated grounds for excuses was not in any manner controverted or questioned. The appellant's counsel simply excepted to the action of the court in granting the excuses.

Section 6, Title 30, Code 1940 makes it imperative for trial judges to inquire into the qualifications of jurors who are summoned to serve. See also, Long v. State, 86 Ala. 36, 5 So. 443; Batson v. State, 216 Ala. 275, 113 So. 300.

We do not find any ruling here upon which a reversal should be based. Boykin v. State, 23 Ala.App. 516, 128 So. 124; Watson v. State, 15 Ala.App. 39, 72 So. 569; O'Rear v. State, 188 Ala. 71, 66 So. 81.

It should not be overlooked that the defendant and his counsel were at all times present during the progress of the indicated proceedings. Therefore the case does not come under the influence of Waller v. State, 32 Ala.App. 586, 28 So.2d 815, and authorities cited therein. See also the very recent cases of Hall v. State, 250 Ala. 681, 36 So.2d 74; Draper v. State, 250 Ala. 679, 36 So.2d 73; McLemore v. State, ante, p. 34, 36 So.2d 452.

The State introduced three witnesses by whom it was proposed to show that the accused had made threats against the deceased. It is contended in brief that the statements did not amount to threats and were not in the nature thereof.

In the case of two of these witnesses the grounds of objections do not raise the questions upon which insistence is made.

One of the witnesses to whom reference is made testified that the defendant stated to him that he would have to get rid of deceased. The court overruled appellant's timely motion to exclude this statement.

In approaching the inquiry it should be kept in mind that we are here reviewing a case in which the doctrine of self defense is a vital factual issue. The jury was impelled to determine which of the two participants was the aggressor in the fatal difficulty.

█ It is generally declared that "declarations of a defendant prior to the commission of the alleged offense, expressing menace or ill will against the person assaulted or injured, are admissible in evidence against him." Ex parte State, 181 Ala. 4, 61 So. 53. See also, Wims v. State, 90 Ala. 623, 8 So. 566.

█ As noted herein, the circumstances which led up to the fatal shooting had their inception in and were incident to a difference between the landlord—the defendant—and the tenant—the deceased. We entertain the view that the statement the accused is charged with having made was pertinent and material to the issues involved and was properly allowed to be considered by the jury in connection with all the evidence in the case. Authorities just supra. See also, Nickerson v. State,

205 Ala. 684, 88 So. 905; Holland v. State, 17 Ala.App. 503, 86 So. 118; Rigell v. State, 8 Ala.App. 46, 62 So. 977.

We copy from the record:

"During his argument to the jury, Mr. Sherman Powell, Special Solicitor for the State, made the following statement:

" 'It is a disgrace that Mr. Hutson, Mr. Almon, Mr. Russell and Mr. Pettus would come in and try to get the jury to believe any evidence such as that.'

"Mr. Pettus: We object to that statement.

"The Court: Objection overruled. Gentlemen of the jury, you are not to be governed by anything except the law and the evidence in this case. The lawyers have the right to make any conclusions they wish, and make comments on it, but you are not to be governed by any remarks which they might make.

"Mr. Pettus: We reserve an exception."

It is insisted that the above statement of the prosecutor cast unfavorable and unfair aspersion at appellant's counsel and on this account the defendant was placed at a prejudicial disadvantage before the jury.

The assertion does not indicate, so far as the record discloses, the evidence to which reference is made. The criticism of the remark must be directed to the use of the expression: "It is a disgrace—" This, of course, in connection with the entire statement.

■ It is true that the word "disgrace" may imply disfavor, shame, contumely, or even dishonor. It is also equally true that the word is often used in a much less odious implication. It is employed to mean lack of grace, unbecomingness, inharmony, and ridiculousness. Expressions must be accepted in keeping with their common usage and the evident intent of the spokesman. The conditions and circumstances under which they are uttered and their relation to the subject matter to which they refer will largely fix the intent.

■ We are unable to agree that the jury was forced to accept the statement as an implication or charge of misconduct against the appellant's attorneys. A contrary view would be a strained and unauthorized construction of the assertion. There is no reversible error here. Espy v. State, 18 Ala.App. 536, 93 So. 307; Walker v. State, 20 Ala.App. 27, 100 So. 564; Watercutter v. State, 21 Ala.App. 248, 108 So. 870; Nixon v. Pierce, 21 Ala.App. 591, 111 So. 200.

The cases of Taylor v. State, 22 Ala. App. 428, 116 So. 415, and Burch v. State, 32 Ala.App. 529, 29 So.2d 422, are clearly distinguishable.

Written charges refused to appellant will now be considered.

■ Those numbered and lettered 1, 2, MM, and XX are general affirmative charges. The evidence clearly presented a jury question.

■ Charge ZZ relates to murder in the first degree. The verdict of the jury eliminated a consideration of this degree of homicide. Brake v. State, 8 Ala.App. 98, 63 So. 11; Shikles v. State, 31 Ala.App. 423, 18 So.2d 412.

■ Refused charge number 10 is an exact counterpart of given instruction number 19. Charge denoted B is a duplicate of given charge number 5. Charge 13 is an exact copy of given charge 15. Title 7, Section 273, Code 1940.

■ In some of the early cases the Supreme Court gave sanction to charge number 14. Prince v. State, 100 Ala. 144, 14 So. 409, 46 Am.St.Rep. 28; Bones v. State, 117 Ala. 138, 23 So. 138; Henderson v. State, 120 Ala. 360, 25 So. 236; Fleming v. State, 150 Ala. 19, 43 So. 219; Adams v. State, 175 Ala. 8, 57 So. 591.

This holding has been abandoned and now it seems well settled by the authorities that the refusal of the instruction does not constitute error. Davis v. State, 188 Ala. 59, 66 So. 67; Edwards v. State, 205 Ala. 160, 87 So. 179; Wilson v. State, 243 Ala. 1, 8 So.2d 422.

This court followed the view of the Supreme Court as expressed in the early cases in Johnson v. State, 4 Ala.App. 47, 57 So. 593; Langston v. State, 16 Ala.App. 123, 75 So. 715. However, beginning with

Beecham v. State, 17 Ala.App. 490, 86 So. 130, we have consistently disapproved the instruction. Bridgeforth v. State, 20 Ala. App. 20, 100 So. 564; Wilson v. State, 20 Ala.App. 137, 101 So. 417; Gilchrist v. State, 20 Ala.App. 307, 101 So. 634; Voss v. State, 21 Ala. 481, 109 So. 891; Bentley v. State, 22 Ala.App. 101, 112 So. 810; Jones v. State, 22 Ala.App. 173, 114 So. 69; Enzor v. State, 24 Ala.App. 346, 135 So. 595; Curlette v. State, 25 Ala.App. 179, 142 So. 775; Hayes v. State, 30 Ala. App. 418, 7 So.2d 93.

The questions we have omitted to treat do not merit discussion.

The judgment of the court below is ordered affirmed.

Affirmed.

## On Rehearing.

On application for rehearing counsel in brief states: " * * * appellant earnestly and respectfully requests that this Honorable Court extend its opinion by setting forth the facts which show that at the time deceased fired on appellant that the latter was standing with his hands down by his sides." The record authorizes it, and of course we have no hesitancy in complying with this request.

The son of the decedent testified that at the time his father fired the first shot the defendant was standing with his hands beside him and holding a pistol in one hand.

We had in mind this detail in the evidence when our former views were expressed.

We still entertain the inescapable conclusion that whether or not the accused was authorized to justify his act on the doctrine of self-defense and whether or not the evidence warranted a conviction of murder in the second degree were questions clearly within the determinable province of the jury.

The jury made its decision, and this finding was sustained by the trial judge. We are not convinced that we should disturb this judgment.

Application for rehearing overruled.