160 So.2d 884

**Carlton CROOK**

v.

**STATE.**

**8 Div. 785.**

Court of Appeals of Alabama.

Nov. 14, 1961.

Rehearing Denied Dec. 5, 1961.

Reversed After Remandment Oct. 15, 1963.

Rehearing Denied Nov. 12, 1963.

Ralph E. Slate and Albert P. Brewer, Decatur, for appellant.

MacDonald Gallion, Atty. Gen., and Paul T. Gish, Jr., Asst. Atty. Gen., for the State.

CATES, Judge.

Carlton Crook killed his wife by shooting into his dwelling house through the front door, the bullet going through the living room and hitting Mrs. Crook who was then standing in the kitchen ironing some clothes.

From a judgment of guilt of second degree murder, he appeals.

The defense tried in the course of the trial to show that the Crooks had the week-end habit of drinking and playfully taking pot shots close to each other. One question sought to elicit that once in the living room she had taken a .22 rifle and had traced her husband's outline by shooting around him as he was standing against the wall.

The trial judge ruled this line of questioning out, apparently because it was not of the res gestae.

However, it was brought out that on the fatal occasion Mrs. Crook had been outdoors and had wrenched a gas operated pellet gun from her husband's hand. The gun went off and put a .22 pellet in his palm in the thick area below the thumb.

Mrs. Crook attempted later (just before she was killed) to take a .22 rifle from their car. The evidence is in conflict as to whether she walked slowly back in the house or whether she ran in with her husband chasing her by firing the rifle into the ground around her feet. Undisputedly he shot at the ground near her feet three or four times.

In the State's closing argument, we find the following:

" * * * Following Mr. Brewer's argument, Mr. Johnson made the closing argument for the State. Mr. Brewer interposed an objection to the following statement in Mr. Johnson's argument:

" 'You put a reasonable construction on it. You don't listen to some new fangled, disgusting theory that springs out from the minds of the imaginative lawyers.'

"Mr. Brewer: We object to the statement: You wont be swayed by this new fangled, disgusting theory that sprang from the agile minds of the lawyers.'

"Mr. Johnson: It was 'imaginative minds.'

"The Court: Gentlemen of the jury, each of the lawyers has the right to place their own construction on the matters before you, so long as they

stay within reasonable bounds. I wont construe it such as to sustain the objection. You place your own construction on the matters before you. The Court will tell you what the law is, and you decide the case according to the law and evidence as you have heard it from the witness stand.

"Mr. Brewer: We except.

"Mr. Johnson: Let's see what inferences or interpretations would be if you subscribe to this defense, within a common sense interpretation. First, human life wouldn't be worth much, would it?,—mine, yours or anybody else. First, you could drink yourself into a mind to kill. How could you escape that? You could finally drink yourself into a license to kill. They say they drank so much, it was a way of life. 'We don't plead self defense; we don't plead insanity or justification,' but just want you to say in this new concept that they just drank themselves into a right to kill. You don't want that in Morgan County, do you?, and I don't, as your prosecuting attorney, and you wouldn't like me if I did. You know, this God-given life is too hallowed and holy. You look back over five thousand years ago, and see the omnipotent hand of God, as He put it on the tablet of Moses on Mt. Sinai, and what did He say? "Thou shall not kill!' He didn't say, 'You can get drunk every day, and you have the right to kill', and He is actually the Judge of this case we are trying. It's a Divine law. We aren't supposed to tamper around with any kind of disgusting new fangled theory.

"Mr. Brewer: We object to the statement: 'We aren't supposed to tamper around with any kind of disgusting new theory'.

"The Court: Gentlemen, the same matters I called to your attention on the last objection apply equally, and I'll overrule the objection.

"Mr. Brewer: We except."

We consider the trial judge erred in not sustaining the objections. The solicitor's counter argument was not directed to the irrationality or inconsistency of the defense argument. Rather it partook of the fallacy of the "argumentum ad hominem" condemned by logicians as appealing to the passions and prejudices of the hearers as distinguished from "ad rem," an argument directed to the matter at hand.

Here the expression "ad hominem" has another meaning since the argument is directed to the person of Crook's counsel.

The symbolic identification of the accused in the personality of his champion is one of the significant drawbacks of the adversary system of our common law. To make the system work fairly, a contestant should have to defend but one cause—the issue against his principal. For a lawyer to have to prove his heart is pure as well as his client's is to make him fight a two front war.

In Taylor v. State, 22 Ala.App. 428, 116 So. 415, 416, we find:

"In the closing argument the solicitor stated:

\* \* \* \* \* \*

" 'They [defense counsel] are laying like vultures to take this case to the Supreme Court.' "

The opinion commented:

"This remark was undignified, highly improper, and had no place upon the trial of this case. It was contumely in all that the word implies and tended to place counsel for defendant in an improper light and disrepute before the jury; this, in the absence of any improper or illegal conduct upon the part of defendant's counsel, who, as shown by the record, were ably and earnestly undertaking to defend their client and to protect him in his legal rights, in accordance with the solemn oath which every attorney at law is re-

quired to take before he shall be permitted to practice in this state."

Another argument deriding defense counsel was the cause of reversal in Burch v. State, 32 Ala.App. 529, 29 So.2d 422, 423. There Bricken, P. J., said:

" *   *   *   the solicitor in addressing the jury  *   *   *   stated: 'Counsel for the defendant are trying to make monkeys out of this jury, and they are laughing up their sleeves at you.'

"It clearly appears that the above quoted statement by the solicitor was wholly unwarranted as not being based upon any fact, incident, or testimony, in the case. Its effect necessarily was harmful and prejudicial. The statement cast opprobrium upon the three reputable members of the bar who were, as the law requires, defending their client to the best of their ability, and in an orderly manner, and tended to place them and their client in a very unfavorable light before the jury. This of itself would necessitate a reversal of the judgment of conviction.

"The office of solicitor is of the highest importance; he is the representative of the state, and as a result of the important functions devolving upon him as such officer necessarily holds and wields great power and influence, and as a consequence erroneous insistences and prejudicial conduct upon his part tend to unduly prejudice and bias the jury against the defendant.

"Certainly, when the trial court, by its action in overruling the objection interposed, the court manifested its approval of the uttered words and gave its full endorsement thereof as being true. The statement, whether so intended or not, was insulting and otherwise objectionable and the court erred to a reversal in not taking prompt and decisive action to eradicate the statement instead of adding his approval thereof to the effect that such state-

ment in the opinion of the court was true.

"In questions of this character the rule is, not that it did so affect the verdict of the jury, but might it have done so."

Reversed and remanded.

## On Rehearing

The State urges upon us that the reason for decision in Little v. State, 34 Ala.App. 114, 39 So.2d 587, 592, should control herein.

In Little v. State, supra, the solicitor in argument said:

"It is a disgrace that Mr. Hutson, Mr. Almon, Mr. Russell and Mr. Pettus [defense counsel] would come in and try to get the jury to believe any evidence such as that."

Judge Carr there pointed out that "disgrace" was capable of several meanings:

"It is true that the word 'disgrace' may imply disfavor, shame, contumely, or even dishonor. It is also equally true that the word is often used in a much less odious implication. It is employed to mean lack of grace, unbecomingness, inharmony, and ridiculousness. Expressions must be accepted in keeping with their common usage and the evident intent of the spokesman. The conditions and circumstances under which they are uttered and their relation to the subject matter to which they refer will largely fix the intent.

"We are unable to agree that the jury *was forced* to accept the statement as an implication or charge of misconduct against the appellant's attorneys. A contrary view would be a strained and unauthorized construction of the assertion.  *   *   *  " (Italics added.)

Etymologically, "disgusting" calls forth an image of "spitting out of the mouth." The word as used in the instant case is an epithet much stronger than "disgrace." Nor

does it admit of any appreciably less odious semantic nuance such as the one which Judge Carr resolved in favor of sustaining the trial judge in Little.

Webster's New International Dictionary, 2d Ed., gives for the verb "disgust" the following three meanings:

"1. To experience intense dislike for. *Obs.*

"2. To excite queasiness or strong physical distaste in; to sicken the stomach of; to nauseate; hence, to provoke (one) to loathing, repugnance, or aversion; to be offensive to the taste or sensibilities of;—often with *at*, *with*, or *by*.

*   *   *   *   *   *

"3. To cause or arouse effective aversion in; to cause (one) to lose an interest or intention through exciting distaste; as, his failures *disgusted* him against further efforts."

"Disgusting," the verbal adjective, in that same dictionary, is defined as, "Causing disgust; sickening; revolting."

Moreover, the expression here used not only carried the emotional content of the word "disgusting," i. e., "fit only to spit out," but also ascribed the so-called disgusting theory to the minds of imaginative lawyers rather than to the evidence. This imputation to defense counsel of inventing reprehensible theories is certainly stronger than and different from the solicitor's remark as construed in the Little opinion.

Espy v. State, 18 Ala.App. 536, 93 So. 307 ("everytime you hit them they squeal"), Walker v. State, 20 Ala.App. 27, 100 So. 564 ("They are trying to befuddle your minds"), Watercutter v. State, 21 Ala.App. 248, 108 So. 870 ("If you believe that you can hire a lawyer like Mr. Scott and get out of it, you will do it, won't you?"—not approved though considered harmless), and Nixon v. Pierce, 21 Ala.App. 591, 111 So. 200, 201 ("You know lawyers don't work for nothing"), all cited by the State, were relied on in the Little case. The arguments

therein are self-evidently different in the degree and kind of refutative idiom employed.

Without analyzing and definitely fixing an exact position for the matter considered in the Little case, we feel that the factual situation here is materially distinguishable.

Application overruled.

### After Remandment

It is now needful to take up points in the record which we laid aside before.

"The record presents many close and difficult questions as to the admissibility and relevancy of evidence. While no entirely new rules of evidence are involved, the application of old rules to new circumstances and conditions is involved. As to some of the questions we are unable to find authorities exactly in point, and can therefore appreciate some of the difficulties which the trial court and counsel have encountered in this case."—Spicer v. State, 188 Ala. 9, at 17, 65 So. 972, at 975:

Sunday, February 28, 1960, there were only three persons at the Crook home: Mr. and Mrs. Crook and their son, Larry, nine years old.

The son was the first prosecution witness. He testified that on the Saturday before, i. e., February 27, he had gone with his parents to Huntsville. They got some groceries, beer and whiskey "in two large bottles."

The boy gave a statement which was introduced by the defendant:

"I went with my daddy and mother to Huntsville on Saturday, February 27, and they bought some groceries and two large bottles of whiskey on the parkway. It was her money that paid for it. Daddy had no money. Mother was the one that made the living. They drank some whiskey Saturday night, but I don't think they drank all of one bottle. I don't think mother drank any whiskey on Sunday. Daddy did drink some Sunday morning. Mother

wouldn't let him have so much. She would keep it from him when she thought he had enough. She would put it up somewhere. My mother worked at Redstone Arsenal at Huntsville. She did drive back and forth to work. She had drank some beer that morning. Daddy had a nap after dinner. Mother wanted something from the store and woke him up but when she saw how he was, she didn't want him to drive on the slick roads. Mother had to help him to his feet after she woke him up. He was half asleep. Mother was afraid he would have a wreck. It was raining hard and daddy wanted to take me to the barber shop that another Fowler runs toward Hartselle. It is an old shop and you can get haircuts there for fifty cents. Daddy was asleep on his feet but he wasn't plumb drunk. His eyes would get glassy like when he was drunk.

"They had fussed a little that morning and some more after dinner. I think it was because she had rolled and hit him in the back with her elbow. He wanted to go get my haircut and sell the rifle to get some beer. Mother didn't want him to because that was the only protection they had. They had sold all the other shotguns and rifles they had. Daddy went to the car and got in the car. This was about 3:00 or 3:30 in the afternoon and it was raining at the time. Mother had a pellet gun under her right arm and went out to the car and asked daddy for the car keys. The pellet gun will go off without pulling the trigger if you jam it hard enough. When she got to the car daddy got out of the car and tried to take the pellet gun away from her. The gun went off and shot him in the hand. They came in the house and Carlton washed the blood off his hand. Irene set down on the couch in the living room, and after he washed his hand she tried to squeeze the pellet out of his hand. When they were at the car I saw daddy grab the gun and it went off in his hand. She had it tucked under her right arm at the time. I call him Carlton and her Irene.

"He took the rifle out to the car that morning. We keep the rifle loaded all time. He was fussing after he got shot in the hand and wanted her to give him some money to go to the doctor. He went back to the car in five or six minutes. She went out to the car to keep him from leaving. He got the rifle out of the car after she started back to the house. He just started shooting four times in the ground at her feet. All added up he shot eight or nine times. Two in the window and two in the door. She first went to the fireplace. I locked door. I was over next to the door when he fired through the window. He wasn't firing too fast, two or three seconds between shots. I got down on the floor next to the wall and crawled on the floor to the door when I locked the door. Mother told me to get away from the door fast. I had just got through locking door when he fired two times through door. When I turned around I saw mother laying in the kitchen floor. I opened the door and called to Carlton, 'You have shot my mother'. Then I ran to her. She kindly mumbled a little bit but didn't speak. We tried to get her to the car and pulled her sweater part way off dragging her. We couldn't get her to the car because she was too heavy and we couldn't make it. She kept her billfold in her bra and it fell to the floor. Daddy had asked her for two dollars to get a haircut and get pellet out of hand but she didn't give it to him. I think she had about thirty or forty dollars in her billfold.

"I told daddy he had better call the ambulance and police. Carlton told me to go to my grandfather Bob Fowler to get some help. I ran up there but papp-pa and grandma were not at home. I ran back home. I remember Carlton picked up Irene's billfold just before I left to go to Papp-pa

Fowler's house. When I got back we got in the car and went to Uncle Hudson Fowler's house. Carlton got out and talked to Uncle Hudson. Uncle Hudson went into the house for a minute or two. Daddy waited until they came back and they talked a second or two more, then we left and went to Bill Parker's house. We went into the house and talked to Parker and came back out in about five minutes and he told me he had called the police. Daddy was mad because mother would not let him have any money. Then he drove me to Uncle Glenn's house."

Larry had testified that Mr. Crook, on going to phone for the ambulance, took with him Mrs. Crook's billfold which "had some papers and some money, and the car keys." There was no tendency other than this which might raise a suspicion of theft or robbery.

The second witness for the State was Dr. Robert B. Johnson of the State Toxicologist's staff. He had made a post mortem dissection of Mrs. Crook's head. He was able to trace the path of the fatal bullet. This path went from entry at the right temple to lodgment at the base of the skull.

The force of the bullet broke a bone at the base of the nose. From this break blood had flowed into the lungs. Mrs. Crook's breathing was blocked as though she had drowned.

Hudson Fowler, the deceased's brother, testified for the State. He described phoning for the ambulance and the condition of the Crooks' house.

Crook went by the house of one Bill Parker. Whether this neighbor was the appellant of Parker v. State, 41 Ala.App. 463, 135 So.2d 169, we do not know. Crook's testimony was that he had Parker phone for an ambulance. From Parker's, Crook went to Decatur and there surrendered to the sheriff.

On his cross-examination, the solicitor asked, "She had a remarkably good salary, did she not?" Objection was overruled.

## I.

### Impeachment of Defendant

The prosecutor, after going into the proposed trip to the barber shop, asked "had he said anything about wanting to buy whiskey too?" The answer was, "No, sir." Continued the questioning:

"Q Or beer?

"A Beer,—he wanted to swap the twenty-two to buy some beer.
twenty-two, get the money for the
"Q Wanted to swap the twenty-two rifle for some beer?

"A Yes, sir.

"Q Did he tell your mother that?

"A Yes, sir.

"Q What did she say?

"A She said she didn't want him to.

"Q Didn't want him to do that?

"A No, sir.

"Q Did they have a little argument over that?

"A Yes, sir.

"Q How long was that before the shooting?

"A 15—I guess about 15 or 20 minutes.

"Q Was that after your mother had refused to give him money? Had he just asked your mother for money?

"A Yes, sir.

"Q She declined to give it to him?

"A Yes, sir.

"Q Then did he later say he was going to trade the rifle off for beer?

"A Yes, sir."

In brief on original submission, we find appellant's counsel submitting:

"The most flagrant error which appears concerns itself with the cross-examination of the defendant * * *. On two occasions [the solicitor] asked the defendant if * * * he had made a statement to Mr. Dexter Haney in substance that he (the defendant) was going to trade the rifle for beer and *was going to sell the beer* (Tr. 124, 126).

"At the time the question was first asked the solicitor stated that his purpose was to refresh the recollection of the witness (Tr. 124). Then on re-cross-examination [the prosecutor] again asked the defendant if he had made the statement in question to Mr. Haney (Tr. 135), and the witness stated that he did not remember telling Mr. Haney that.

" * * * the net effect of allowing these questions against objection was to allow the solicitor to attempt to impeach the defendant on an immaterial matter. If the defendant did intend to sell the rifle, the purpose for which he was going to use the proceeds of such sale could have no bearing on the issues on this trial, and the Appellant submits that the purpose of the question was to prejudice and inflame the minds of the jurors against the defendant. We need only to look to the argument of the solicitor to see his improper motive in asking this question and in seeking to get this evidence before the jury. The solicitor made this statement in his argument to the jury:

" 'There is some testimony he wanted to take a valuable rifle and sell it on the afternoon of the Sabbath, and buy beer and sell it.' (Tr. 147).

"It might be argued that this evidence was admissible for the purpose of attacking the credibility of the witness or of showing prior inconsistent statements, but the solicitor has given us his true motive in offering this evidence, when he argued to the *jury* not that the defendant had made a prior inconsistent statement or that the defendant had sworn falsely on the witness stand, but that the defendant was going to buy and sell beer on the Sabbath. The defendant objected to the statement and the court overruled the objection. The action of the trial court was in effect to approve the statement of the solicitor and to tell the jury that it could consider his argument as being proper and substantiated by the evidence.

"This Court knows that Morgan County is a 'dry' county and has consistently voted to remain 'dry' on elections called for the purpose of having the people express themelves on the legal sale of alcoholic beverages. It necessarily follows that there is a great deal of feeling in this county and that the overwhelming sentiment in the county is against alcoholic beverages. The effect of the questions of the solicitor, his argument to the jury and the trial court's ruling on the objections to the questions and the argument was to place in the minds of the jury the impression that the defendant was a bootlegger and had in his mind the intent to commit the crime of violating the prohibition laws of the State of Alabama at the time the incident in question occurred.

"Proper objection was made when Mr. Hancy was asked by the solicitor about the previous statement allegedly made by the defendant and used by the solicitor to impeach the defendant. Obviously the defendant was subjected to impeachment on an immaterial matter, and in addition his substantial rights suffered infringement by having extraneous matter placed before the jury and underscored by the trial court's overruling of objections to each of the questions and the subsequent argument of the solicitor." (Italics added.)

Was Haney's testimony so connected with the homicide issue as to contradict a part

of Crook's testimony bearing on the homicide? We think not, Ortez v. Jewett, 23 Ala. 662; Lang v. State, 84 Ala. 1, 4 So. 193; Smith v. State, 261 Ala. 270, 73 So.2d 916.

■ The early cases often quote from 1 Greenleaf, Evidence, § 449:

"*  *  * if a question which is collateral or irrelevant to the issue, is put to a witness *his answer cannot be contradicted by the party who asked the question, but it is conclusive against him.*" (Italics ours.) See Ortez v. Jewett, supra, Rosenbaum v. State, 33 Ala. 354; Blakey's Heirs v. Blakey's Ex'x., 33 Ala. 611; Crawford v. State, 112 Ala. 1, 21 So. 214.

■ The rebuttal testimony here was offered "to impeach"; it was on an immaterial question, and going to "general credit" was inadmissible. See Noble v. State, 253 Ala. 519, 45 So.2d 857; Haley v. State, 63 Ala. 83. See also People v. Perry, 277 N.Y. 460, 14 N.E.2d 793; Wigmore, Evidence (3rd Ed.), §§ 1003, 1020, 1021; Wharton, Crim. Evidence (12th Ed.), § 914; 98 C.J.S. Witnesses § 633. As to "general credit" and "particular credit," see Bemis v. Kyle, 5 Abb.Prac., N.S., 232.

The cross-examining party gets no nearer to the truth of the main issue by proving the witness is a liar on a side issue. At some point the journeying down by-paths must cease. The point of departure (except where the peregrination is to show bias, animus, corruption, or other reflection of the witness as credible peculiarly to the instant trial) is reached on the descent to an area having nothing to do with the case.

Since permissible inferences from Haney's testimony admit of the probability of prejudicing Crook in the eyes of the jury, we cannot excuse its admission as error without injury under Supreme Court Rules, rule 45, Code 1940, Tit. 7 Appendix and the last sentence of Code 1940, Tit. 15, § 389. Hence, we are required to reverse the judgment below and remand this cause there for a new trial.

The above is a verbatim paraphrase from Lowe v. State, 40 Ala.App. 9, 122 So.2d 382, affirmed 271 Ala. 699, 122 So.2d 386.

## II.

### Wife's Prior Shooting at Husband

■ Defense counsel asked the boy as to his parents having had prior difficulty—shooting between them. The trial judge let the question in "to test his memory."

The next question was, "how long before that was it?" Objection was sustained. Then, in trying to show Mrs. Crook had used the .22, the son was asked, "To refresh your recollection didn't she fire this gun at your daddy about two weeks before this happened?" The court sustained objection to this question—apparently as immaterial.

An accused wife could show that before killing him she had filed for a divorce from her husband: Wright v. State, 252 Ala. 46, 39 So.2d 395. This on the premise of thus showing "the personal relationship between them and illuminating the claimed overt act of the deceased." In Shiflett v. State, 262 Ala. 337, 78 So.2d 805, where accident was advanced to account for the wife's death, it was error to keep out evidence of relations between husband and deceased—his wife.

In view of the holding in Shiflett v. State, supra, and Kitchens v. State, 251 Ala. 344, 37 So.2d 428, we consider there was an applicable theory under which details of prior difficulties would seem to have been relevant.

This theory rests upon the necessity in homicide cases of a jury's not only specifying in their verdict the degree and kind of homicide, i. e., first or second degree murder or voluntary or involuntary manslaughter, but also of fixing the prisoner's punishment.

Mr. Justice Goodwyn, in Boggs v. State, 268 Ala. 358, 106 So.2d 263, wrote for the court:

"We have examined the entire record and are not satisfied that the admission of such evidence was without injury to substantial rights of appellant. He was charged with and found guilty of murder in the first degree; and we think the evidence clearly supports such finding. But, in so finding, it was within the sole discretion of the jury to prescribe as punishment either the death penalty or imprisonment in the penitentiary for life. Code 1940, Tit. 14, § 318. We cannot possibly probe into the mental processes of the jurors to ascertain whether and to what extent the incompetent testimony actually had in influencing the exercise of their discretion in fixing the punishment. We are not willing to say it did not have some influence on them, thus affecting the substantial rights of appellant."

It would appear, therefore, from Judge Foster's reasoning in the Shiflett case, supra, that any evidence bearing on the state of relations between the killer and his victim would be relevant, even though such pleas as insanity or self defense were not in the case.

In the instant case, the jury twice came back from the jury room to request further instruction on legal malice. Also, we note that the punishment fixed by the verdict is the minimum which the law permits for second degree murder.

But the defense was offering this testimony with the statement of counsel that there were "over a hundred" bullet holes "in the house * * * they had shot at each other before, and turned around and loved each other * * * shot at each other like most folks fuss at their wives; she shot at him * * *. She didn't appear to be afraid of him. He shot into the ground and she turned casually and walked into the house."

We are unwilling to depart from the implications of the common law. An agreement—such as for a duel or Russian roulette—is nothing more than a contingent suicide pact.

Suicide is murder at Common Law. iv. Bl. Comm. 189–190. An agreement compassing it is a criminal conspiracy. If one of the conspirators dies, under McMahan v. State, 168 Ala. 70, 53 So. 89, the survivor—if he contributed to the suicide whether present or not—can legitimately be found guilty of murder. Anno. 13 A.L.R. 1262. See also Glanville Williams, The Sanctity of Life (1957, Knopf N. Y.): Carpentier Lectures at Columbia University School of Law.

Hence, we see no error in the trial judge's rejecting further questions for the purpose stated. We think the answer expected could reasonably be viewed as hurting the defendant more than helping him.

### III.

### ARGUMENT

In addition to ascribing to defense counsel their contriving a novel "disgusting" theory as undoing divine law, the solicitor in final argument made two other statements to which objection was made.

### A.

"He wanted * * * [to sell beer] on the Sabbath."

The first of these remarks we have referred to in discussing the contradiction of the defendant on an immaterial matter. The record shows:

"Mr. Brewer interposed an objection to the following statement in Mr. Johnson's argument:

" 'There is some testimony he wanted to take a valuable rifle and sell it on the afternoon of the Sabbath, and buy beer and sell it'.

"MR. BREWER: We object to the statement: 'There is some evidence he wanted to take a valuable rifle and sell it on the Sabbath and buy beer for it'.

"MR. JOHNSON: Trade it for beer and *sell the beer*.

"MR. BREWER: We object to the last statement.

"THE COURT: Gentlemen of the jury, you have heard the evidence, and I instruct you, instructed you at the time it came that it doesn't make any difference to you, and should not make any difference to you as to whether he was going to sell any beer or not, because of the fact you are not concerned with proof of the fact he wanted to do that, *but it was allowed to go to you for other purposes which will be explained to you generally in the charge,*—not specifically. *I will overrule the objection. I will say there is no evidence in this case that he has committed any other offense, so far as you are concerned, other,*—there is no evidence one way or the other concerning any other offense, and you will not be prejudiced by any reference to any other act which comes in this case in a legal way, and it is in this case in a legal way,—any evidence on that point,—you will not be influenced if it does show some other law was violated or intended to be violated. Objection overruled.

"MR. BREWER: We except." (Italics added.)

The trial court in effect treated the defense objection as resting on a claim that the solicitor was contending that the evidence showing that Crook had sold beer— or had held himself out to sell beer—on Sunday.

The wording of the record before us in the use of "he wanted * * * and [to] sell it" leads us to the view that the solicitor was going into the defendant's state of mind. Adding a sale of a contraband commodity, alcohol, to a breach of the Sunday law clearly would have a manifest tendency to heap prejudice on the defendant. To show that he was getting ready— as by driving off with the rifle—could be as damning as the doing of the deed itself.

The trial judge recognized this but considered Haney's evidence as being admissible to show inconsistency in Crook's testimony. (We note here the son's testimony in no wise extended to Crook's purposing to sell the beer, only to swapping the rifle for it.)

Thus there was actually no evidence in the case of Crook's wanting to sell beer. Haney's testimony—which was erroneously admitted under Lowe v. State, supra—was of a statement allegedly made in his presence, was hearsay as to Haney's having any actual knowledge and if it were admissible, could have come in only as admission by the defendant.

Our Supreme Court is unanimous in condemning argument of "a substantive, outside fact—stated as a fact—and which manifestly bears on a material inquiry before the jury."—Simpson, J., in Johnson v. State, 272 Ala. 633, 133 So.2d 53; see also Outlin v. State, 22 Ala.App. 640, 119 So. 246.

There being no evidence of any intent to sell the beer, reference to it was of an outside fact, prejudicially and incorrectly stated to be inferable from "some testimony" manifestly bearing on the quarrel between husband and wife.

The view of this quarrel taken by a jury could make a difference between murder and manslaughter. In this connection we point out that the maximum term for manslaughter is ten years, the least for murder is the same. The jury here twice came back for clarification of the distinguishing mental element—malice—and finally brought in a punishment which could have been equally legally set for first degree manslaughter as for second degree murder.

Furthermore, we find nothing in the oral charge as to the Court's reason for letting the argument stand because of the purported evidence bearing on a limited end.

B.

"Drunken brothel"

The last objected to argument is shown in the record thus:

"Mr. Brewer interposed an objection to the following statement in Mr. Johnson's argument:

" 'The people of Alabama expect you to return a verdict that will shout on the archives of Morgan County that you can't turn your home into a drunken brothel.'

"MR. BREWER: We object to the words, 'drunken brothel'.

"THE COURT: Would you say what it was you object to?

"MR. JOHNSON: I withdraw the statement.

"THE COURT: It's withdrawn, gentlemen. Don't consider it."

There was no evidence which would admit of any inference that the Crook's home was a bawdy house.

■ However, after the withdrawal of the statement there remains only a question of whether or not the use of the expression in the first place was ineradicable. Washington v. State, 259 Ala. 104, 65 So.2d 704.

The Washington opinion was in 1953. Headnote 3 rests in part on the need to reserve an exception to the court's ruling. This formality to later reconsideration or review has been dispensed with under the Act of April 1, 1955 (No. 44, p. 150, 1955 Acts). In Travis v. Hubbard, 267 Ala. 670, 104 So.2d 712, Simpson, J., points out the Rule 46 of the Federal Rules of Civil Procedure is the source of this abolition of requiring exception.

Eradication or removal of prejudicial matter ordinarily involves (a) what is before the court, and (b) if prejudicial the effect of any corrective action.

The requisites for such action are that it be sure, swift and certain: prompt, clear and forceful. Johnson v. State, 242 Ala. 278, 5 So.2d 632; Myhand v. State, 259 Ala. 415, 66 So.2d 544.

We lay aside a consideration of the three instances of objected to argument as single items.

### C.

### Cumulation to Prejudice

The leading authority for this principle (three strikes and out, see Lawson, J., dissenting in Myhand, supra) is the seldom applied case of Blue v. State, 246 Ala. 73, 19 So.2d 11. Under the reasoning there, argumentativeness in questioning may be weighed along with other conduct, e. g., verbal statements summing up for the State. Cf. Humphries v. State, 38 Ala. App. 388, 84 So.2d 669.

Thus, in Humphries v. State, supra, though the trial judge in virtually every instance sustained objection and, at the more acutely disparaging efforts, charged the jurors to direct their minds away from the sway of passion and prejudice into the path of reason and relevance. Yet this was not enough to head off reversal.

It may be that jurors have had their perception cauterized against the efficacy of flights of "old style oratory"; that the use of high flown hyperbole may be taken for forensic nonsense as Mr. Justice Merrill once said. Also, the trial judge, in most things, is given discretion because of hearing the tone of voice and the effect on the jury.

In the instant case, in view of the clear cut impeachment on an immaterial point, we refrain from passing on the other matters which we referred to solely to facilitate their not coming up on another trial.

The motion for new trial was due to be granted. Therefore, the judgment of the circuit court is reversed and the cause is there remanded for further appropriate proceedings.

Reversed and remanded.

JOHNSON, J., took no part in the consideration or decision of this case.