308 So.2d 722

**Charles E. GUNTHARP**

**v.**

**STATE.**

**8 Div. 372.**

Court of Criminal Appeals of Alabama.

July 30, 1974.

Rehearing Denied Oct. 1, 1974.

Robert Straub, Noble J. Russell, Dan F. Nelson, Decatur, for appellant.

William J. Baxley, Atty. Gen., and George W. Royer, Jr., and George M. Van Tassel, Jr., Asst. Attys. Gen., for the State.

CATES, Presiding Judge.

Second degree murder: sentence, eighteen years in the penitentiary.

Guntharp allegedly, in conjunction with Stewart Weaver, killed James Floyd Davis by shooting him with a pistol. The grand jury charged them both in one indictment. They were tried separately. Code 1940, T. 15, § 319.

The tendency of the State's evidence was that appellant and his employee, Weaver, took Davis for a ride. One, or the other, shot Davis—according to the State's theory. The place was the parking lot of a shopping center. From there the two-coindictees went to Guntharp's undertaking establishment. Guntharp then had calls made for an ambulance and for the police.

During the direct examination of Lt. Frank W. Shafer, Jr., of the Decatur Police Department, we find the following:

"Q. Well, now, what if anything, did you find when you got to the funeral home?

"A. Well, when we pulled up in the parking lot, we pulled in and pulled around to the parking lot, and we parked about [sic] a Cadillac and we got out of the patrol car and went into the garage part of the funeral home and walked back to a kinda [sic] of an open space there, where they drink coffee, and nobody was around and we heard voices in a small office. And we walked into the office and there was two men in the office.

"Q. Who were they?

"A. Charles Guntharp and Stewart Weaver.

"Q. Did you know Stewart Weaver as being a policeman?

"A. Yes, sir.

"Q. Well, now, what, if anything, happened when you went into the office?

"A. Nothing sir.

"Q. Did you say anything?

"A. Yes sir.

"Q. Well, now, what, if anything, do [sic] you say?

"A. I ask them if they called.

"Q. And what happened? Did either of them say anything at that time?

"A. Nothing.

"Q. Nobody answered?

"A. No, sir.

"Q. Well, what, if anything, did you do then?

"A. Well, I sat down on the couch there by Stewart Weaver.

"Q. Well, what, if anything, happened then?

"A. Well, I asked him again if there anything [sic] going, and Stewart got up and started to the doorway.

"Q. Well, now, what, if anything happened then? Did Stewart say anything when he went to the doorway?

"A. Yes, sir. He said, come with me.

"Q. What happened then?

"A. Well, Mr. Guntharp asked him to come back.

"Q. Mr. Guntharp asked him to come back?

"A. Yes, sir.

"Q. Well, now, what, if anything, did Mr. Guntharp ask him?

"A. Well, he asked him to come back.

"Q. Well, now, did Stewart Weaver come back?

"A. Yes, sir. He came back and sat down.

"Q. Well, now, what, if anything, happened then?

"A. Well, I asked them if they needed help.

"Q. Well, now, what, if anything, happened then?

"A. Well, there was no answer then, and Stewart got back up and again started back to the door.

"Q. He got up a second time?

"A. Yes, sir.

"Q. Well, now, what, if anything, happened then?

"A. Well, Mr. Guntharp asked him to come back again.

"Q. Mr. Guntharp asked him to come back again?

"A. Yes, sir.

"Q. Did he tell him to sit down?

"A. No, he told him to come back.

"Q. Did he sit down?

"A. Yes, sir.

"Q. Stewart Weaver sat down?

"A. Yes, sir.

"Q. Well, now, what, if anything, happened then?

"A. Well, Mr. Guntharp said, 'Stewart, didn't he kick you?' [Quotation and question marks added.]

"Q. And what, if anything, was said then?

"A. Well, then there was no reply.

"Q. Well, now, what did Mr. Weaver do?

"A. Well, he got up a third time.

"Q. And was this when Mr. Guntharp said that, 'didn't he kick you?' [Quotation marks added.]

"A. Yes, sir.

"Q. And, what happened then?

"A. Well, he asked me to come with him again, and he started out the door.

"Q. Well, now, did Mr. Guntharp say anything then?

"A. Yes, sir.

"Q. What did he ask him then?

"A. Well, he asked him to come back a third time.

"Q. He asked him to come back a third time?

"A. Yes, sir.

"Q. Well, now, where did Stewart go then?

"A. Well, he went on outside, into the area where they drink coffee.

"Q. Well, now, did you go with him?

"A. Yes, sir. I followed him, and he started into the garage area back towards the back door, sir. And I was—

"Q. Excuse me just a minute.

"MR. NELSON: No, wait a minute, Your Honor. We object to any statement made by Mr. Weaver outside of the presence of the defendant. We didn't object when they were supposed to be together as I understand it. Could I ask Lt. Shafer one question? Where did Mr. Guntharp stay? Back in the room, there?

"A. Yes, sir.

"MR. NELSON: Now we object to any statement made outside the presence [sic —of?] the defendant, Mr. Guntharp, as being inadmissible as set out in the case of State of Alabama verses [sic] Burton and Ruton, [sic] and it says 'Where people

were jointly indicted that statements made outside the [sic] defendant were inadmissible' and ground number two, as to the hearsay, we couldn't cross examine that statement and we object. [Quotation marks added.]

"Q. I have one more question before we make our argument, Your Honor. Approximately, how much time had elapsed between the time that you first got the call and the time that you started out of this door, there, with Stewart Weaver. The maximum amount of time?

"A. Well, my best judgment would be, I would say around nine minutes.

"Q. Nine minutes?

"A. Yes, sir.

"MR. BAXLEY: Your Honor, we think that it is part of the res gestae and part of the occurences. [sic] And we will rest on the brief that we submitted. We think that sits [sic] out the proper proposition of the law and think it is descretionary [sic] with the Court.

"MR. STRAUB: Well, Your Honor, we feel that it is not a part of the res gestae, and is is [sic] inadmissible. And by the witness's own admission, this was nine minutes after he got the call and there has been no testimony that there has been a crime committed. We don't know what time that took place, so we are at least nine minutes away from that, and there is no testimony at all that there's been a crime committed or when. And we have got nine minutes there and it is not part of the res gestae. And secondly, Your Honor, it purports to be testimony of a co-conspirator or co-defendant, coming after the occurence of the alleged crime. And there is a difference as to what is admissible, before or after, from a co-conspirator and this comes well after, at least nine minutes after, and now the declarent [sic] has had an opportunity, some nine minutes of opportunity, after the officer got there to formulate what he might be going to do or

might not be going to say and this is clearly way beyond the realm of the res gestae rule, and there had been no crime committed or any incremating [sic] statements or answers, after the ends of the conspiracy, if there was one, started after that has been accomplished, if it has been, and there has been no proof of that. Then the conspiracy is over at that time, and any statement made by a co-conspirator or any accomplice or whatever you call them is inadmissible in this Court or any other Court.

"THE COURT: Overruled."

Then, among other things and over continued objection, Mr. Shafer testified that outside the presence and hearing of Guntharp, Weaver said that Guntharp shot Davis.

To put the trial court in error appellant cites Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476; Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934; Everage v. State, 113 Ala. 102, 21 So. 404; Edwards v. State, 279 Ala. 371, 185 So.2d 393, and Macon v. State, 30 Ala.App. 276, 4 So.2d 439. To which we add Connelly v. State, 30 Ala. App. 91, 1 So.2d 606; and Bell-Isle v. State, 44 Ala.App. 598, 217 So.2d 550.

In *Connelly,* supra, the Court of Appeals, per Simpson, J., said:

" * * * statements of * * cocon-spirator made after the termination of the conspiracy are not admissible, unless so clearly related to the commission of the offense as to be a part of the res gestae or unless made in the presence of the defendant and undenied by him, in which latter case they become admissible under the rule of tacit admissions. * * * "

From *Edwards,* supra, we quote:

"In the instant case, the second and third statements attributed to Coon were made in furtherance of the common de-

sign. The statements were made by Coon, when defendant was not present, several days after the crime had been accomplished and after all four of the participants in the crime had been taken into custody. Because Coon did not make the statements until after the completion and termination of the common enterprise, the statements were not admissible against the instant defendant under the rule which allows the statement of one confederate to be shown in evidence against another confederate who was not present when the statement was made."

■ The admissibility vel non of an accomplice's statement made outside the presence and hearing of the other accused depends in essence on whether there is at the time of the accomplice's utterance a viable nexus of mutual agency inter sese. See Morgan, A Suggested Classification of Utterances Admissible as Res Gestae, 31 Yale L.J. 229.

Thayer is quoted as saying the slippery forensic slogan "res gestae" (the things done) was first used by Garrow and Lord Kenyon—"two famously ignorant men." Apparently the phrase originated as "res gesta" but fructified in its ambiguity into its present plurality. R. v. Tooke, (1794) 25 Howell State Trials 440.

In Poellnitz v. State, 48 Ala.App. 196, 263 So.2d 181, Judge Moore wrote:

"The *Edwards* case, supra, does hold that such acts and statements made *after* the completion of the offense and the conspiracy ends are not admissible against another involved in the offense.

"In the instant case the ends of the conspiracy had not been accomplished in all of its details in that the property taken was still being transported away from the filling station and had not reached its final intended resting place. In other words the scheme was still in progress when the two cars were stopped and the tires recovered by the officers." [Italics added.]

Also on analogous principle, efforts to conceal evidence, fruits of a crime or otherwise obstruct discovery could fall within the concept of the "thing done."

The Attorney General in his brief submits that we have here an instance of spontaneous exclamation citing language from Nelson v. State, 130 Ala. 83, 30 So. 728.

We shall not essay a full outline of the critical facts in *Nelson,* supra, other than to say that the spontaneous exclamation came within two minutes of a shooting. We quote:

" * * * In our opinion the circumstances detailed by the witness Stoutenborough bring the declarations made to him by Sumner within the rule of admissibility. Sumner had just been desperately wounded. He was in flight, and yet within the range of his assailant's gun. Only two minutes had elapsed since the actual shooting. There had, it would seem, been no opportunity for the formulation of a deliberate statement. * * * "

The principle of "opportunity for the formulation of a deliberate statement" is also illustrated *contra* in Shiflett v. State, 38 Ala.App. 662, 93 So.2d 523, from which we quote:

"The defendant again offered the testimony of Dr. Hardwick as to Mrs. Shiflett's saying, 'I don't believe Harold meant to do it.' This offer apparently was bottomed on the immediately-upon-regaining-consciousness-statement theory as a part of the res gestae exception to the hearsay rule. 32 C.J.S., Evidence, § 419, note 34, p. 52; 20 Am.Jur., Evidence, Sec. 672; 163 A.L.R. at page 164.

"The statement was made in the emergency room at the hospital some three to five minutes after she became conscious.

Apparently Mrs. Shiflett did not speak at all for some time, i. e., three to five minutes. Her first statement was to ask if she would recover (262 Ala. 337 at page 344, 78 So.2d 805 at page 811). Then, as a police officer came in the room, Dr. Hardwick said, 'Betty, Officer Haynes has come to ask you something about what happened.' The doctor continued, 'Betty, how did all this happen?' To which she gave the answer the defendant sought to get told to the jury.

"The trial court refused the admission of her answer as being an opinion. With this ruling we agree. The statement came as the response to a question which required reflection to answer. See Norwood v. State, 11 Ala.App. 30, 65 So. 851. The principle of spontaneous exclamation may not require that the declaration be speedy but it must be spontaneous. The vice is not after-speech but after-thought."

In Shaneyfelt v. State, 41 Ala.App. 130, 124 So.2d 466, Harwood, P. J., wrote:

"To be part of the res gestae statements must be impelled by the main transaction, and so spontaneously expressed as to be considered a part thereof. The main transaction must be the sole cause of the statement. The fact that Mrs. Shaneyfelt's statement was not made for some 10 to 15 minutes after the time of her injury in itself casts some doubt on the admissibility of the statement because of the lapse of time. However, where a statement is made in response to a question, it cannot be said to originate solely from and to be impelled by the main transaction, *for the question is the thing that originates the statement, and not the main transaction.* Louisville & N. Railroad Co. v. Pearson, 97 Ala. 211, 12 So. 176; Richmond & Danville Railroad Co. v. Hammond, 93 Ala. 181, 9 So. 577; Shiflett v. State, 38 Ala.App. 662, 93 So.2d 523. Thus Mrs. Shaneyfelt's statement as related by the witness Beauchamp, cannot be consid-

ered as admissible as a part of the res gestae and thereby removed from the hearsay rule which would ordinarily prevent its admission. The court therefore erred in its ruling in the premises.

"It cannot be denied that the admission of this evidence was harmful to the appellant. * * *" [Italics added.]

*Shaneyfelt,* supra, and *Shiflett,* supra, however, must be harmonized with the latest case on spontaneous exclamations. Williams v. State, 291 Ala. 213, 279 So.2d 478. Therefrom we quote:

"As Williams lay mortally wounded in his driveway, a neighbor asked 'Who done it?' and Williams said 'Eunice done it.' Appellant objects to admission of this evidence. This was admissible as being part of the res gestae.

"For a statement to be admissible as part of the res gestae exception to the hearsay rule, it must be incident to what was done, as shedding light on the main fact. George v. State, 240 Ala. 632, 200 So. 602 (1941); Starks v. State, 137 Ala. 9, 34 So. 687 (1903); Nelson v. State, 130 Ala. 83, 30 So. 728 (1901). See also McLean v. State, 16 Ala. 672 (1849).

"Here, deceased replied, 'Eunice done it,' *immediately* after being shot. The statement in this case, unlike the statement in Shiflett v. State, 38 Ala.App. 662, 93 So.2d 523 (1957), cert. denied 265 Ala. 652, 93 So.2d 526 (1957), was not objectionable as an opinion. The court in *Shiflett* refused the admission of the response of the deceased made in the hospital, 'I don't believe Harold meant to do it,' as being an opinion. The statement in this case required no particular reflection or thought. We think that the trial judge could reasonably conclude that the statement was a part of the res gestae." [Italics added.]

■ Even though a co-conspirator's statement made while in the course of committing a joint crime is admissible as

against his absent co-felon [see West v. State, 168 Ala. 1, 53 So. 277] yet here we consider that the circumstances clearly show that at the time of Weaver's answer to Shafer's question the alleged joint venture was over—probably for half an hour if measured from the time of the shooting or—fifteen minutes from the summoning of the police. Hence, the admission of the answer was error. *Edwards,* supra; also see Annot. 4 A.L.R.3d 671, which collates at pp. 679–680 ten Alabama authorities.

We entertain no doubt that the answer was prejudicial to Guntharp.

In view of the remandment of this cause for trial de novo we point out that the rule of relevance is applied more strictly in criminal cases than in civil. Adherence to this guideline should obviate recurrence of adverse rulings which might be complained of on another trial.

The judgment below is reversed and the cause remanded.

Reversed and remanded.

All the Judges concur except ALMON, J., who recuses self.