The appellant, Israel O'Cain, was convicted of murder after a jury trial and was sentenced to 30 years' imprisonment and, inter alia, was ordered to pay $35,357.40 restitution. He appeals, raising one issue. He contends that the trial court committed reversible error by admitting into evidence *Page 36 
the hearsay statements of the victim implicating him in her murder as spontaneous exclamations and dying declarations.
Shortly before 9:00 a.m., Karen Dale, a niece of the victim, Linda Daughtry, heard a loud knock on her second floor apartment door. She peeped through the observation hole in the door and saw her aunt, Linda, outside. Linda lived in the apartment on the first floor just below hers. She observed Linda lie down and get up. She opened the door and let her in, and immediately Linda told Karen to lock the door and call the police. Linda lay on a couch, and Karen observed blood on Linda's back and what appeared to be gunshot wounds in her back. Karen asked Linda who shot her, and Linda replied, "Israel shot me." Karen observed that Linda looked scared, that her voice was weak, and that she kept her eyes closed most of the time. She appeared alert, conscious, and wanted ice water because her stomach was burning. Karen testified that Linda said that she had been in bed asleep when Israel came in threatening to kill himself; that she asked him if he was planning on taking her life; that he began fighting with her; that she got away; that he shot her; and that he then turned the gun on himself.
Karen called the police and they, along with ambulance personnel, arrived at Karen's apartment around 9:15 a.m. Yvonne McBride Baldwin, an investigator with the Prichard Police Department, immediately upon arriving at the apartment asked the victim, "What is the problem?" The victim said she had been shot in the back and made the following statements: "Get me some help. I need some help. I feel like I am dying." Officers Charles Kennedy and M.C. Durden, Jr., also testified that they asked the victim who had shot her and that she said, "Israel O'Cain." Durden further testified that he asked the victim where Israel was and that she said that he was downstairs. He also testified that the victim said, "Please get me some medical attention." He told her, "Ma'am, they are on their way. Please hold on."
While the officers were examining the victim, they heard what sounded like two muffled gunshots from the victim's apartment below. They rushed to the victim's apartment and found Israel O'Cain, the appellant, lying face-down on the floor, apparently in serious condition from three gunshot wounds to the chest. A .22 caliber pistol and six empty shell hulls lay on the floor nearby. According to the officers, O'Cain told them that he did not want to live. The appellant and the victim had been intimately involved and had lived together in the past, but were not living together at the time of the shooting.
The appellant and the victim were transported to the hospital. The victim arrived at the hospital about 9:30 a.m. in extremely serious condition, and in spite of the efforts of a medical trauma team which performed extensive surgery she died around 7:00 p.m. that evening. A medical examination of the victim disclosed that she had been shot three times in the back with a .22 caliber pistol. When the shots were fired, the pistol had been pressed hard against the victim's back, making what is called a "contact" wound. Two bullets passed through the victim's right kidney and liver. One passed through her spleen. The bullets damaged major veins and arteries. She died as a result of the loss of blood from the injuries caused by the gunshots. Three .22 caliber bullets were removed from the victim's body. Ballistic examination disclosed that they were fired from the pistol found near the appellant. All six of the empty shell casings were also fired from the same pistol. The three bullets which entered the appellant's body were not recovered because they fragmented when they struck bones.
The appellant testified that he was visiting the victim in her apartment; that they were on friendly terms; that suddenly she pointed the .22 caliber pistol at him and told him to leave; that he grabbed her by the shoulders and asked for an explanation; that she shot him in the chest; that he grabbed her and they fell on the bed; and that he did not remember anything else until the officers were questioning him. He testified that he did not remember anything after he was shot the first time; that *Page 37 
he was in "shock"; and that he had no intention of committing suicide.
When the appellant objected to the admission of the statements of the victim during the trial on the ground that they were hearsay, the trial judge overruled the objection on the belief that they were spontaneous exclamations. When the issue was raised again during the hearing on the motion for a new trial, the trial court, again holding that the statements were admissible, stated that they were also admissible as dying declarations.
 "A dying declaration is a statement made by the victim of a homicide, at a time when the victim believes that death is impending, describing the cause of, and the circumstances attending, the homicide. Such a statement is admissible, as an exception to the hearsay rule, on the ground of necessity, and on the theory that a person expecting imminent death, just as a person testifying under the obligation of an oath, will speak nothing but the truth.
 "It must be shown that the declarant was facing death, with no hope of recovery, and that he was aware thereof. If these requirements are satisfied, the declaration is admissible to the same extent that the testimony of the declarant would have been, had he been called as a witness."
C. Torcia, Wharton's Criminal Evidence § 301 (14th ed. 1986). See also, C. Gamble, McElroy's Alabama Evidence § 248.01(1) (3d ed. 1977).
It is not indispensable that the declarant should have said that he believed that he must or would die soon, as such belief may in the circumstances be inferred from his condition and his conduct. C. Gamble, supra, at § 248.01(1). In determining whether the declarant believed that death was imminent, the trial court may look to statements of the deceased, the nature of his wounds, his weakness, and all the circumstances tending to show the deceased's state of mind at the time. Ragland v.State, 238 Ala. 587, 192 So. 498 (1939); Bell v. State,402 So.2d 1 (Ala.Cr.App. 1981); Voudrie v. State, 387 So.2d 248
(Ala.Cr.App.), cert. denied, 387 So.2d 256 (Ala. 1980). Statements by the declarant are admissible to show his belief that death was impending, and such statements alone may constitute a sufficient foundation. Carson v. State,439 So.2d 1350 (Ala.Cr.App. 1983); Voudrie v. State; C. Torcia, supra, at § 309. A dying person need not expressly state that he is going to die. The use of words which are the equivalent of such a statement is sufficient. Marshall v. State, 219 Ala. 83,121 So. 72 (1929). It has been held that the use of the expression, "I think I am going to die," was a sufficient predicate for the admission of a statement as a dying declaration. Evans v.State, 209 Ala. 563, 96 So. 923 (1923).
Whether the declarant believed that death was certain to occur soon is for the determination of the trial court, reversible upon appeal only if the evidence did not warrant such a finding. Marshall v. State; Carson v. State; Shikles v.State, 31 Ala. App. 423, 18 So.2d 412 (1944), cert. denied,245 Ala. 641, 18 So.2d 417 (1944). " 'The circumstances of each case will show whether the requisite consciousness existed; and it is poor policy to disturb the ruling of the trial judge upon the meaning of these circumstances.' " Evans v. State,209 Ala. at 564, 96 So. at 924 (quoting 2 Wigmore on Evidence § 1442, p. 1809).
We conclude, from our review of the instant case, that the evidence presented by the state was sufficient to show that the victim was conscious that her death was impending, so as to render admissible her statements against the appellant in the murder prosecution as a dying declaration. The seriousness of her wounds, her weakened condition as exhibited by her lying or falling on the floor while waiting for her niece to open the apartment door, the obvious loss of blood from the massive injuries, her lying on the couch with her eyes closed asking for ice water because "her stomach was burning," her concern about her son, and her statements — "Get me some help. I need some help. I feel like I am dying." — are sufficient to warrant a finding that she was aware that she was facing imminent death, with no hope of recovering. We *Page 38 
conclude that there was ample evidence to support the ruling of the trial court in admitting the hearsay statements of the victim as dying declarations.
In reviewing the trial court's finding that these statements were also admissible as spontaneous exclamations, we are guided by the following:
 "Generally, a person's statement concerning a startling occurrence made while he is perceiving the occurrence, or soon after his perception thereof, and while he is under the stress of a nervous excitement created by such perception, is admissible as tending to prove the truth of the matter asserted. A statement of this kind is frequently referred to as a spontaneous exclamation or excited utterance and is an exception to the hearsay evidence rule.
". . . .
 "The declaration must be instinctive rather than deliberate."
C. Gamble, supra, at § 265.01(1). See also C. Torcia, supra, at § 289.
The question of whether the statement is spontaneous in a given case is to be decided upon the facts and circumstances of that case, and such determination is a question for the trial court. Jones v. State, 53 Ala. App. 690, 304 So.2d 34, cert. denied, 293 Ala. 761, 304 So.2d 38 (1974); C. Gamble, supra, at § 265.01(2).
 "The trial court, in determining whether the statement was made spontaneously, ought to consider: the degree of startlingness of the occurrence; how much time passed after the occurrence but before the statement was made; the effect of intervening events; the nearness of the place where the statement was made to the place of occurrence; the condition of the declarant; the content of the statement itself; and all other facts relating to whether the declarant was under the stress of a nervous excitement at the time he made the statement."
C. Gamble, supra, at § 265.01(2).
An issue which frequently arises is whether a statement made in answer to a question can be spontaneous and therefore admissible as an exception to the hearsay rule. While we have decisions which hold that such statements are not within the exception because the question requires reflection and deprives the response of spontaneity, we think the better rule is that a statement made in response to a question is admissible as a spontaneous exclamation if the person answering was still under the influence of the excitement or shock of the crime. We have decisions which appear to follow what we consider to be the better rule. See Williams v. State, 291 Ala. 213, 279 So.2d 478
(1973) (where victim of shooting, who lay mortally wounded in his driveway, responded to question by neighbor of who did it by saying that victim's wife "done it," such statement was admissible as part of the res gestae); Guntharp v. State,54 Ala. App. 363, 308 So.2d 722 (1974), writ quashed, 293 Ala. 756,308 So.2d 728 (1975) (holding that the issue is whether the answer was part of the res gestae, and if it is within the resgestae, the issue is whether the answer required reflection); C. Gamble, supra, at § 265.01(3); C. Torcia, supra, at § 289.
In reviewing the evidence to determine whether the statements of the victim were made spontaneously, we consider the following: The victim was shot three times in the back by a .22 caliber pistol. The bullets caused major internal injuries and massive bleeding. The pistol barrel was pressed against her body when the shots were fired. It is reasonable to infer from the circumstances that she immediately fled the apartment and went upstairs to her niece's apartment for protection and assistance. It is hard to imagine an occurrence more startling. She arrived at her niece's apartment shortly before 9:00 a.m. The police arrived by 9:15 a.m., and the victim was at the hospital by 9:30 a.m., and "in extremis." The statements she made implicating the appellant in the crime in response to the questions asked by her niece and the police officers were made within a few minutes of the shooting. The distance between the place where the statements were made and the place where the shooting occurred was only a few feet. There were no intervening events. When *Page 39 
she arrived at her niece's apartment, she was in serious condition, in pain, and she thought she was going to die. There can be no doubt that, under the circumstances, the victim was under the stress of nervous excitement when she made the statements.
We recognize that the statements were made in answer to questions — such as "Who shot you?" and "What is the problem?" — asked by the victim's niece and law enforcement officers; however, we believe that the circumstances surrounding the statements reasonably justify the conclusion that they had been uttered while the victim remained in shock and excited by the shooting and the resulting injuries, and were a part of the resgestae, even though they were made in response to questions. The surrounding circumstances clearly justify the conclusion that the statements were not made upon reflection.
In our opinion, the questions asked of the victim were insufficient to destroy the spontaneity of the responses. Thus, we conclude that there was sufficient evidence to support the trial court's ruling admitting the statements of the victim as spontaneous exclamations. This case is due to be, and it is hereby, affirmed.
AFFIRMED.
All Judges concur.